### Ex parte George Edward McFARLAND, Applicant.

### No. AP–75044.

Court of Criminal Appeals of Texas, En Banc.

May 18, 2005.

---

Walter E. Herman III, Humble, for Appellant.

Jack Roady Asst. District Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion for a unanimous Court.

This is an original application for writ of habeas corpus filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure. Applicant was convicted of capital murder and sentenced to death in August of 1992. This Court affirmed Applicant's conviction on direct appeal.[1] Applicant alleged twenty-three claims for relief in his original habeas corpus application filed on May 21, 1997. After an evidentiary hearing, the trial court entered Findings of Fact and Conclusions of Law and recommended denying relief.

In his Findings of Fact, the trial judge noted that almost all of the twenty-three habeas claims in applicant's original habeas corpus application had been raised and rejected on direct appeal.[2] There would normally be no habeas review for any of these issues. On November 17, 2004, we adopted the trial court's finding and conclusions on claims three through twenty-three and denied relief. However, applicant's first two habeas claims deal with whether his trial attorneys provided effective assistance of counsel. The first claim is that one of those attorneys slept through large portions of the trial. After these ineffective assistance of counsel claims were rejected on direct appeal, the Fifth Circuit held, in *Burdine v. Johnson*,[3] that when a lawyer sleeps through significant portions of trial this conduct results in the constructive denial of counsel.[4] Based upon *Burdine*, we filed this application to reconsider our decision on direct appeal that applicant failed to show that he had been "denied counsel" under the Sixth Amendment or that his attorneys provided constitutionally "ineffective assistance of counsel."[5] After reviewing the evidence,

1. *McFarland v. State*, 928 S.W.2d 482 (Tex. Crim.App.1996) (*en banc*).

2. *See McFarland v. State*, 928 S.W.2d 482 (Tex.Crim.App.1996). One new claim asserted that applicant's direct appeal attorney was constitutionally ineffective because his attorney filed many extensions, was forced to show cause why the brief had not been timely filed, and ultimately filed a poor brief. On appeal, counsel raised thirty-three points of error in the initial brief. He then filed a supplemental brief raising thirty-five more points of error. This Court thoroughly addressed all of those points of error in a lengthy published opinion. The trial court concluded that appellate counsel's representation was sufficient to "protect his right to reasonably effective counsel in the primary case." Further, applicant failed to show that, but for appellate counsel's performance, he would likely have prevailed on appeal. *Ex parte Owenby*, 749 S.W.2d 880, 881 (Tex.Crim.App.1988) (to prevail on ineffective assistance of appellate counsel claim, defendant must "must be able to show that the outcome of his appeal would be different" had counsel provided competent counsel).

A second new claim was a *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), allegation concerning the purported suppression of the grand jury testimony of Walter Burks and the destruction of the tape of Craige Burks's telephone call to Crime Stoppers. In its writ findings, the trial court concluded that applicant failed to show that: Mr. Burks's grand jury testimony contained *Brady* evidence; the State withheld the transcript of Mr. Burks's testimony; admission of the grand jury testimony would have been favorable to applicant; the State "withheld" the Crime Stoppers tape which was destroyed in accordance with Houston Police Department policy after six months; or the tape contained any exculpatory evidence. We adopted these findings and denied relief on those claims on November 17, 2004.

3. 262 F.3d 336 (5th Cir.2001).

4. *Id.* at 341, 349 (concluding that an "[u]nconscious counsel equates to no counsel at all" for purposes of the Sixth Amendment right to counsel in a criminal case).

5. Applicant's specific claims are as follows:

   1) McFarland's Sixth Amendment right to the assistance of counsel has been deprived.

the trial court's Findings of Fact, and the applicable law, we now deny relief on those two habeas claims as well.

## I.

### A. The Evidence at Trial

Shirley and Kenneth Kwan ran a grocery store in Houston. Mr. Kwan and the store's security guard, James Powell, went to the bank twice a week for money to cash customers' payroll checks. On November 15, 1991, the two men returned from the bank with a bank bag containing $27,000 in cash. As they pulled up to the store, Mr. Powell noticed applicant sitting nearby with a bag of leaves on his lap. As Mr. Kwan and Mr. Powell got out of the car, applicant jumped up and shouted at Mr. Powell, who was carrying a shotgun: "Drop the gun. Drop the gun. If you don't, I'll blow your Goddamned brains out." Mr. Powell dropped the gun. Mr. Kwan ran to the front door of the store, but applicant fired two shots at him. Mr. Kwan stood inside the doorway for a second and then dropped to the floor as more shots were fired. Applicant's accomplice followed Mr. Kwan into the store. As applicant yelled "Grab the bag," the accomplice, wearing a ski mask, stood over Mr. Kwan, shot him in the back, and grabbed the bank bag. Mr. Kwan died from his wounds. He had been shot a total of five times.

Carolyn Bartie, a friend and customer of the Kwans, saw the entire robbery-murder from her car in the store's parking lot. Ms. Bartie testified that she waved at Mr. Kwan, who was getting out of his car, and she noticed applicant sitting nearby. She could see his face. He did not wear a disguise and never attempted to cover his face.

Four days after the robbery-murder, applicant's nephew Craige Burks called Crime Stoppers and said that three men were involved in the crime: applicant, Michael Clark, and Albert Harris. Burks testified at trial that two weeks before the robbery, he was driving with Michael Clark when Clark pointed to Mr. Kwan's grocery store and said that "he was going to retire from armed robbery and that the Chinese guy [sic] supposed to bring him a bunch of money." Burks also said that, on the day of the robbery, applicant came by his house in a new car with a "bundle of money" and took him, his brother, and his uncle for a ride. Applicant told them he had dressed like a hobo, robbed and shot a Chinese guy, and pulled a pistol on the security guard. He claimed that he and his two accomplices stole $50,000.

Houston Police Officer Bill Stephens investigated the robbery-murder of Mr. Kwan. Acting on Burks's tip, Officer Stephens showed Mr. Powell and Ms. Bartie a photo line-up. Mr. Powell made a tentative identification of applicant, and Ms. Bartie made a positive identification of him.

During the punishment phase, the State offered evidence of applicant's three prior convictions, including an armed robbery, and evidence of three unadjudicated offenses.

First, in September of 1991, applicant robbed two Wal–Mart employees in the store parking lot as they returned from the bank with over $5,000 in cash. One of the victims identified applicant as the man who put a machine gun to his head and demanded the money. Applicant and his accomplice drove off in the employee's truck, and, when one of the victims fol-

2) The representation of McFarland falls far below an objective standard of reasonable- ness and prejudiced the outcome of his trial.

lowed them in another car, applicant got out of the truck and fired a shot at him.

Second, just two days after the Wal-Mart robbery, applicant was arrested for an altercation in a nightclub parking lot. Earlier in the evening he had gotten into a shouting match with another nightclub patron. A security guard later saw the men still shouting in the parking lot, then he saw applicant retrieve a handgun (later found to be loaded with hollow-point bullets) from his car and put the gun to the other man's back. The security guard ran over and grabbed it.

Third, in December of 1991, police received information about a forthcoming "bank-bag robbery" on Lockwood. For over an hour they followed Michael Clark—one of applicant's accomplices in the robbery-murder of Mr. Kwan—driving a red Jeep around town when they saw applicant getting out of a stolen van which had been traveling with the Jeep.

The defense put on three punishment phase witnesses. The custodian of records for the Harris County Jail testified that applicant had not been involved in any disciplinary incidents while in custody for this murder. Applicant's supervisor at a paper company testified that applicant was a good worker during his five-year employment. Finally, applicant's wife testified that she and applicant had two children and that he had always been good to her.

## B. Applicant's Legal Representation

Shortly after his arrest for capital murder, applicant hired his own trial counsel, seventy-two-year-old John Benn. He retained Mr. Benn even though Mr. Benn had never tried a capital murder case under current Texas law. Three months after Benn made his first court appearance, the trial judge, in an abundance of caution, appointed Sanford Melamed to serve as Mr. Benn's co-counsel. Mr. Melamed was a considerably younger attorney with considerably more trial experience, albeit not in capital cases.[6] The judge warned Mr. Melamed that he was to follow Mr. Benn's lead; he was not to make any decisions in the case without first seeking the approval of both Mr. Benn and applicant. However, the trial judge also warned Mr. Melamed that he should be prepared to try the entire case on his own.

Applicant wanted nothing to do with Mr. Melamed and refused to sign the appointment of counsel form. He wanted only Mr. Benn's assistance.[7] Richard Frankoff, an attorney who had represented applicant on other criminal charges, sent applicant a letter stating that he had known Mr. Melamed for years, that "[h]e is a very committed and competent attorney," and that applicant should talk with Mr. Melamed.

Mr. Benn, like applicant, also refused Mr. Melamed's assistance. Mr. Melamed repeatedly tried to meet with applicant's retained counsel to discuss trial strategy and divide up trial duties. Mr. Benn kept putting him off. As a result, the two lawyers had virtually no pre-trial contact, and they never had a significant substantive conversation about the case.

---

6. Sanford Melamed testified at the writ hearing that he had practiced criminal law for fourteen years, had been retained or appointed in over two hundred misdemeanor cases and over six hundred felony cases, and had tried approximately thirty felony jury trials.

7. Ironically, one of applicant's direct appeal claims was that the trial court violated his "constitutional right to counsel of his choice"

by foisting an appointed lawyer upon him to assist his retained counsel. 928 S.W.2d at 508. This Court concluded that "[w]here a trial court deems, as in the instant case, that retained counsel may need assistance, it is acceptable to sua sponte appoint additional counsel, and [this] does not violate a defendant's right to counsel of choice." *Id.*

Mr. Melamed testified that he knew that neither his client nor his co-counsel wanted his involvement in this case. Mr. Melamed did not want to come between Mr. Benn and applicant, but, as the trial neared, he realized he would be trying this case essentially by himself. Mr. Benn testified at the writ evidentiary hearing that he had spent just four hours preparing for applicant's capital murder trial. He also admitted that he did not file any pre-trial motions, interview or subpoena any witnesses, or visit the crime scene.

Mr. Melamed, on the other hand, testified that he took numerous steps to prepare for trial—studying a capital murder treatise, consulting with experienced capital-litigation lawyers, observing portions of a capital trial, and filing numerous pre-trial motions. Mr. Melamed said that, by the time the trial began, he was fully prepared to handle every aspect of it. Had he needed more preparation time, he would have asked for a continuance.

Mr. Melamed said that the trial judge asked applicant at least twice before the trial whether he wanted to continue with retained counsel Mr. Benn. Applicant said, "Yes," and he never requested other or additional counsel. Applicant never expressed dissatisfaction with Mr. Benn to either the judge or Mr. Melamed.

At trial, Mr. Melamed provided the lion's share of legal representation; Mr. Benn sometimes slept during trial. At the hearing on the motion for new trial, he explained, "I'm 72 years old. I customarily take a short nap in the afternoon." Virtually everyone in the courtroom noticed Mr. Benn sleeping.[8] Mr. Melamed stated that he first saw Mr. Benn sleeping during parts of voir dire, and it got worse as the trial progressed. He said that the bailiff would nudge Mr. Benn's chair during the trial to awaken him, and the judge admonished Mr. Benn on numerous occasions.[9]

During its case-in-chief, the State put on fourteen witnesses, but Mr. Benn cross-examined only three. Although Mr. Benn said that he would prepare applicant's mitigation case for the punishment phase, he did not, so again Mr. Melamed did. Mr. Benn did present a closing argument to the jury. His remarks were extremely concise. He simply asked the jury not to be swayed by an "eye for an eye" mentality, but rather to have sympathy for his client and to spare his life.

## II.

Applicant contends both that he was denied counsel under the Sixth Amendment and that he received constitutionally ineffective assistance of counsel. Under *Strickland v. Washington*,[10] a defendant claiming ineffective assistance of counsel must demonstrate that (1) counsel's conduct "fell below an objective

8. In an affidavit submitted in the habeas proceeding, one juror stated that Mr. Benn's sleeping "was so blatant and disgusting that it was the subject of conversation within the jury panel a couple of times."

9. After one of these incidents, the trial judge again asked applicant if he wanted a different lead counsel appointed. Again, applicant declined. The writ record does not indicate whether applicant himself knew that his retained lawyer frequently napped during the trial. Although the present facts might well raise an issue of waiver, the trial court made no findings on that issue. Thus, we will not address the question of whether a defendant who refuses to accept the offer of different, appointed lead counsel, when he knows that his retained attorney does not remain awake during trial, forfeits any Sixth Amendment claim based on that counsel's penchant for napping.

10. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

standard of reasonableness," and (2) this incompetence caused the defendant prejudice.[11] Under *Strickland*, however, there are a few situations in which prejudice under the second prong will be presumed because these errors are both "easy to identify" and "easy for the government to prevent."[12] In those situations, it is "likely that case-by-case inquiry into prejudice is not worth the cost."[13] Such presumed-prejudice errors include the "actual or constructive denial" of counsel or "state interference" with counsel's assistance.[14]

## A. Actual or Constructive Denial of Counsel Claim

■ Applicant's first claim is that he was actually or constructively denied counsel because of his retained attorney's persistent habit of napping during the trial. He argues that when Mr. Benn slept through significant portions of his trial, applicant was totally deprived of that counsel's assistance. Applicant notes that in *United States v. Cronic*,[15] the Supreme

Court held that a defendant's Sixth Amendment rights are violated "if the accused is denied counsel at a critical stage."[16] Under *Cronic* and its progeny, a defendant is denied counsel not only when his attorney is physically absent from the proceeding, but when he is mentally absent as well, *i.e.*, counsel is asleep, unconscious, or otherwise actually *non compos mentis*.[17] This prong of *Cronic* is epitomized by the "inert"[18] or "potted plant" lawyer who, although physically and mentally present in the courtroom, fails to provide (or is prevented from providing) *any* meaningful assistance.[19] In this situation, courts presume prejudice based upon the actual or constructive denial of counsel "when such absence threatens the overall fairness of a trial."[20]

We agree that applicant did not have Mr. Benn's active assistance during his postprandial naps and that those naps occurred during "critical stages" of his trial. However, as this Court stated in the direct appeal of this case:

**11.** *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052.

**12.** *Id.* at 692, 104 S.Ct. 2052.

**13.** *Id.*

**14.** *Id.*

**15.** 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

**16.** *Id.* at 659, 104 S.Ct. 2039.

**17.** *Id.* at 659, 104 S.Ct. 2039; *see also Burdine v. Johnson*, 262 F.3d 336, 345 (5th Cir. 2001) (*en banc*) (distinguishing between the total lack of counsel and ineffective assistance of counsel; noting that prejudice is presumed "when, during a critical stage of a trial, counsel is either (1) totally absent, or (2) present but prevented from providing effective assistance"); *Javor v. United States*, 724 F.2d 831, 833–34 (9th Cir.1984) (defendant's Sixth Amendment right to counsel was violated be-

cause his attorney slept through a substantial portion of his trial).

**18.** *Gochicoa v. Johnson*, 238 F.3d 278, 284–85 (5th Cir.2000) (stating that prejudice is presumed under *Cronic's* constructive denial of counsel prong "only when the defendant demonstrates that counsel was not merely incompetent but inert, distinguishing shoddy representation from no representation at all").

**19.** *See Bell v. Cone*, 535 U.S. 685, 696–97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (noting that, under *Cronic*, an attorney's failure to test the prosecution's case must be "complete"; only when defense counsel " 'entirely fails to subject the prosecution's case to adversarial testing' " does presumption of prejudice apply) (quoting *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039); *see also Florida v. Nixon*, 543 U.S. ——, ——, 125 S.Ct. 551, 555, 160 L.Ed.2d 565 (2004); *French v. Jones*, 332 F.3d 430, 439 (6th Cir.2003).

**20.** *Burdine*, 262 F.3d at 347.

Appellant had two attorneys. Appellant was never without counsel. Additionally Melamed stated at the motion for new trial hearing that he was prepared to do everything in the case. Although we do not condone Benn's behavior, viewing the totality of circumstances, appellant fails to make any showing that he was not effectively represented at trial by Melamed.[21]

Had Mr. Benn been the sole attorney, applicant's Sixth Amendment right to counsel might well have been denied under *Cronic*. But, Mr. Benn was not his sole attorney.

■ Applicant now contends that, although he did have the constant, actual and active participation of a second lawyer, "Melamed was an inexperienced lawyer who was paralyzed by blind deference to an often unconscious lead counsel." He asserts that he is entitled to relief under *Cronic* and its "presumed prejudice" standard because both of his attorneys "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing."[22] Because, as discussed below, we conclude that Mr. Melamed provided constitutionally effective representation, we necessarily reject the proposition that applicant had "no meaningful assistance."

Under these circumstances, we cannot presume prejudice under *Cronic*. Applicant has failed to demonstrate that the fundamental fairness of his trial was

threatened by Mr. Benn's conduct because his co-counsel was an awake, active, and zealous advocate in the adversarial testing of the prosecution's case.

## B. Ineffective Assistance of Counsel Claims

In his second claim for relief, applicant alleges ineffective assistance of counsel under *Strickland* because of his counsel's collective failure to: (1) properly investigate and prepare for trial; (2) effectively cross-examine the State's witnesses; (3) call mitigation witnesses; (4) advocate for the client during closing argument at the punishment phase; and (5) reveal a conflict of interest.[23]

■ To prevail on these "ineffective assistance" claims, applicant must satisfy both prongs of the *Strickland* test. First, he must prove that his counsel's conduct was objectively deficient.[24] In assessing this, we look to see if counsel was acting as "a reasonably competent attorney" would under the circumstances.[25] Applicant has the burden of proof and must overcome a "strong presumption that counsel's performance fell within the wide range of reasonable professional assistance."[26] This highly deferential review is employed to avoid "the distorting effect of hindsight."[27] Thus, applicant must show that his attorneys made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[28]

21. 928 S.W.2d at 505.

22. *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039.

23. Applicant included his "sleeping lawyer" claim as one of his enumerated "ineffective assistance" claims, but because another competent attorney provided zealous representation during those interludes, we need not address the issue of Mr. Benn's ineffective assistance.

24. *Id.* at 694, 104 S.Ct. 2039; *Ex parte Nailor*, 149 S.W.3d 125 (Tex.Crim.App.2004).

25. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

26. *Id.* at 689, 104 S.Ct. 2052.

27. *Id.*

28. *Id.* at 687, 104 S.Ct. 2052.

■ Second, even if a habeas applicant can demonstrate that his counsel's actions were objectively deficient, he must still prove that their deficient performance prejudiced his defense.[29] He must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[30] The Supreme Court has defined this "reasonable probability" as a "probability sufficient to undermine confidence in the outcome."[31] In capital cases, the question is whether the defendant would not have been found guilty of capital murder or whether "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[32] Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.[33]

We turn now to each of applicant's claimed ineffective assistance errors.

### 1. Pre-trial Investigation and Preparation Claims

■ Applicant claims that neither of his attorneys "perform[ed] any pre-trial investigation, let alone reasonable investigation." He claims that Mr. Melamed's failure to interview the prosecution witnesses was "manifestly unreasonable," and argues that the "State's case against McFarland was thin at best."

At the writ hearing, Mr. Melamed testified to numerous pretrial preparations. For example, he studied the leading treatise on capital murder defense. He also consulted with, observed, and discussed the facts of this case with three other defense attorneys who had experience in capital murder trials. In addition, he reviewed the State's files and submitted eight pre-trial motions, including a discovery motion, a motion for investigator fees, a motion to suppress the identification evidence, and numerous motions in limine. He hired an investigator, visited applicant once in the Harris County Jail, and conferred with him on the telephone and during trial.

■ Mr. Melamed explained that his investigator did not attempt to interview the State's eyewitnesses because he "believed it would not have been a good expenditure of investigator's fees," and he viewed prosecution witnesses as being generally unwilling to "voluntarily cooperate" with defense counsel. This was a strategic decision, made after Mr. Melamed consulted with more experienced counsel in Harris County.[34] Instead, he had his investigator visit the crime scene, canvass nearby locations in an attempt to find other eyewitnesses, photograph the crime scene, construct a scene diagram, and review the ballistics report and offense reports with him.

Further, when applicant finally spoke with Mr. Melamed, he gave counsel a list

29. *Id.*

30. *Id.* at 694, 104 S.Ct. 2052.

31. *Id.*

32. *Id.* at 695, 104 S.Ct. 2052.

33. *Cronic*, 466 U.S. at 656, 104 S.Ct. 2039.

34. *See Burger v. Kemp*, 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (noting that "[t]he district judge, who presumably is familiar with the legal talents and character of the lawyers who practice at the local bar and who saw and heard the witness testify, is in a far better position than we are to evaluate a charge of this kind, and the regional courts of appeals are in a far better position than we are to conduct appellate review of these heavily fact-based rulings").

of potential witnesses, but Mr. Melamed was unable to locate them. Mr. Melamed also suggested calling various witnesses, including Mr. Frankoff, Walter Burks, or some other family member, to challenge the competency and credibility of Craige Burks-one of the State's star witnesses-but applicant rejected all of these suggestions.[35]

The trial court found that Mr. Melamed had developed a two-pronged defense trial strategy before trial began: (1) that the person who committed the murder "committed, at most, felony murder rather than capital murder"; and (2) that the evidence was insufficient to prove, beyond a reasonable doubt, that applicant was present and committed the offense. The trial court found, as did this Court on direct appeal, that counsel's pre-trial investigation was constitutionally reasonable.[36]

▮ Furthermore, applicant fails to demonstrate how the failure to conduct further pretrial investigation prejudiced him. Applicant argues that if defense counsel had interviewed Craige Burks or reviewed his grand-jury testimony more thoroughly, they would have discovered "inconsistencies" between that testimony and his trial testimony. He also relies upon an undated post-trial affidavit purportedly signed by Craige Burks contradicting much of his trial testimony (and possibly establishing perjury on one of the two occasions), but there is no showing or suggestion that Mr. Burks would have told anyone this version before he testified at trial. Thus, applicant fails, under *Strickland,* to demonstrate prejudice in counsel's alleged failure to conduct additional pretrial investigation.

Based upon our review of the record, we agree with the trial court's findings that Mr. Melamed's trial preparation was objectively reasonable under the circumstances and consistent with a coherent trial strategy.

2. *Cross–Examination Claims*

▮ Applicant claims that his attorneys failed to adequately cross-examine the only two witnesses who definitively tied him to the crime, Carolyn Bartie, an eyewitness to the killing, and Craige Burks, who called Crime Stoppers to implicate his uncle. Applicant claims that his lawyers should have attacked Ms. Bartie's credibility as an eyewitness.[37] However, Ms. Bartie testified consistently at both the identification hearing and at trial that she saw applicant holding the security guard and firing at Mr. Kwan. Moreover,

35. *See (Frank) McFarland v. State,* 845 S.W.2d 824, 848 (Tex.Crim.App.1992) ("When a defendant preempts his attorney's strategy by insisting that certain evidence be put on or kept out, no claim of ineffective assistance can be sustained").

36. *McFarland,* 928 S.W.2d at 500–01.

37. Specifically, applicant points out that Ms. Bartie originally described the assailant as being approximately 5'8" and 150 pounds, whereas applicant asserts that he is 6'2" and 200 pounds. Applicant also argues that counsel failed to confront Ms. Bartie with the fact that her version of the event purportedly conflicted with the factual accounts offered by other witnesses at the scene. But, even if that were true, the rules of evidence prevent an attorney from impeaching one witness's testimony with the testimony of other witnesses. *See, e.g., McKinney v. State,* 491 S.W.2d 404, 408 (Tex.Crim.App.1973) (allowing prosecutor to ask defendant on cross-examination if State's witnesses were "lying" for testifying inconsistently with defendant's version was argumentative, but not reversible error); *Mason v. State,* 449 S.W.2d 47, 49 (Tex.Crim. App.1969); *United States v. Henke,* 222 F.3d 633, 643 (9th Cir.2000) (forcing a witness to comment on another witness's testimony is inappropriate); *State v. Maluia,* 107 Hawai'i 20, 108 P.3d 974 (2005). Counsel cannot be condemned for failing to do something that he is not permitted to do.

she identified applicant from a photo spread and a live lineup.

Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial.[38] It is frequently a sound trial strategy not to attack a sympathetic eyewitness without very strong impeachment.[39] Otherwise, an attorney risks reinforcing the eyewitness' previous identification of the defendant as the assailant.[40]

Furthermore, cross-examination is an art, not a science, and it cannot be adequately judged in hindsight. For example, had counsel so vigorously cross-examined Ms. Bartie as to raise serious doubts about applicant's identity as the robber-murderer, the State might well have been allowed to offer evidence during the guilt stage about applicant's extraneous Wal–Mart "bank-bag" robbery two months before the capital offense. A defense strategy that avoids the introduction of extraneous offenses under Rule 404(b) is not constitutionally ineffective.

Next, applicant contends that counsel should have questioned Craige Burks about previous inconsistencies in his testimony to the grand jury. In particular, he claims that when Burks testified

before the grand jury he stated that applicant discussed the murder while they were in a family member's house, yet at trial, he testified that they discussed the murder while riding in a car. However, these two statements are not necessarily in conflict with one another, and they can be easily reconciled. In any event, it is impeachment on a relatively minor issue.[41]

In sum, counsels' failure to cross-examine these witnesses on certain discrepancies did not fall below an objective standard of reasonableness. Applicant's suggestion that cross-examination should have been conducted in a different way "does not rebut the presumption that counsel's conduct fell within the wide range of reasonable professional assistance."[42] Moreover, applicant fails to show that there is a reasonable probability that the result of his trial likely would have been different had his attorneys impeached the witnesses on these particular matters.

Based upon its reading of the trial record, the habeas court found that "during the guilt-innocence phase of the applicant's trial, trial counsel vigorously cross-examined all of the State's substantive witnesses ... [and] addressed any conflicts in witnesses' testimony." Like the claims above, this issue was raised and rejected

---

38. *Coble v. State,* 501 S.W.2d 344, 346 (Tex. Crim.App.1973).

39. *See, e.g., Dannhaus v. State,* 928 S.W.2d 81, 88 (Tex.App.-Houston [14th Dist.]1996, pet. ref'd).

40. *See id.* (noting that "[i]f ineffective, cross-examination can serve to bolster the credibility of the witness and underscore the very points that are sought to be impeached. Thus, unless there is a good basis on which to cross-examine ... it can be more effective to refrain from cross-examining a damaging witness to minimize the impact of his testimony").

41. Applicant also claims that counsel should have pointed out an internal inconsistency in Craige Burks's testimony. At one point, Mr. Burks testified that applicant said that he shot the complainant, but later he testified that applicant said that Albert Harris shot the complainant. During closing argument, the State pointed out that Mr. Burks testified that Harris, not applicant, shot Mr. Kwan. Had the defense emphasized the point that Mr. Burks also testified that applicant shot the complainant, this might well have harmed, not helped, the defense case.

42. *Resendiz v. State,* 112 S.W.3d 541, 548 (Tex.Crim.App.2003) (citation omitted).

on direct appeal.[43] Applicant does not present sufficient new evidence to persuade us that our original decision was wrong.

### 3. *Mitigation Evidence Claims*

■ Applicant claims that his attorneys were ineffective for failing to present mitigation witnesses at the punishment stage of his trial. Although the defense case at punishment lasted only fifteen minutes, this fact alone does not automatically result in ineffective assistance of counsel. Some of the responsibility for such a short mitigation case lies with applicant.[44] Mr. Melamed attempted to obtain the names of possible punishment witnesses from applicant. Applicant, however, rebuked Mr. Melamed's attempts to develop punishment witnesses and specifically instructed him not to contact members of his family.[45] He told Mr. Melamed that Mr. Benn would handle that portion of the trial.

The trial court found that Mr. Melamed talked with applicant for several hours on several occasions about potential punishment-phase evidence and discussed applicant's personal life with him. Mr. Melamed determined that there were no *Penry*-type issues in applicant's case. Based upon the evidence at the writ hearing, the trial court further found

> that Melamed attempted to obtain names of possible punishment witnesses from the applicant; that the applicant

rebuked Melamed's attempt to develop punishment witnesses and specifically instructed Melamed that counsel Benn would take care of it; and, that counsel Benn stated that he would take care of having the applicant's relatives present for the punishment phase.

■ Despite his writ allegation that counsel should have called any number of witnesses, including family members, applicant names only one potential mitigation witness: Richard Frankoff. Mr. Frankoff is an attorney who had formerly represented Mr. McFarland and had known him for over eight years. In his affidavit, Mr. Frankoff states that he would have testified that he knew Mr. McFarland to be "friendly and agreeable" and not a "violent man." Although Mr. Frankoff's testimony on direct examination could have been beneficial to the defense, his attorneys might well have made a wise strategic decision in not calling him. If Mr. Frankoff had testified, the State would have been permitted to cross-examine him about his past representation of applicant, and specifically, his representation on the "violent" Walmart "bank-bag" robbery, which was essentially a mirror image of this case. The trial court found that Mr. Melamed made a strategic decision not to call Mr. Frankoff during the punishment phase. Moreover, applicant himself specifically requested that Mr. Frankoff not be called to testify. Given the potential hazards involved, we

---

43. *McFarland,* 928 S.W.2d at 506.

44. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant").

45. Applicant cannot claim that his counsel was constitutionally deficient for abiding by

applicant's specific, explicit directive to refrain from contacting or calling specific potential witnesses. *See (Frank) McFarland,* 845 S.W.2d at 848; *Duncan v. State,* 717 S.W.2d 345, 348 (Tex.Crim.App.1986)(stating that when defendant preempts attorney's strategy by insisting that a particular defense be followed, claim of ineffectiveness will not stand; holding that defense counsel was not ineffective when he attempted to follow trial strategy "thrust upon him" by defendant).

cannot conclude that counsel's decision not to call Mr. Frankoff constituted ineffective assistance.[46]

Furthermore, this matter was raised and rejected on direct appeal.[47] Applicant has failed to name any specific witnesses, other than Mr. Frankoff, whom his attorneys should have contacted or called as mitigation witnesses. Likewise, he has failed to show that these unnamed witnesses were available to testify or that their testimony would have benefitted him. Therefore, he fails to show prejudice.[48]

### 4. Jury Argument Claim

■ Next, applicant claims that Mr. Benn's closing remarks to the jury during the punishment phase essentially conceded his guilt and bolstered the State's case. Mr. Benn was the last person to speak to the jury on applicant's behalf. As part of his closing remarks, he told the jury that:

If we could exchange George's life for his [Mr. Kwan's], I would say alright, but killing one man is not going to bring back the life of another man. Eye for an eye, a tooth for a tooth went out of civilized religion a long time ago.

Applicant argues that the jury would interpret these comments as an admission of guilt. However, this argument was made at the punishment phase after the jury had already found applicant guilty. Therefore, Mr. Benn's conduct was not objectively deficient: he merely accepted what the jury had already decided.[49] Additionally, even if counsel's comments were an admission of guilt, applicant has failed to prove that they prejudiced his case. Applicant has not shown that, but for Mr. Benn's argument, the jury likely would have answered the special issues differently.[50] He has failed to prove either prong of the *Strickland* test.

### 5. Conflict of Interest Claim

■ Finally, applicant claims that Mr. Benn had a conflict of interest. He contends that Mr. Benn previously represented Michael Clark, who was, according to Craige Burks, peripherally involved in this capital murder.

■ The trial court concluded that relief on this ground should be denied for various reasons. First, applicant failed to show that his attorney is the same John Benn who represented Michael Clark or that this person was the same Michael

---

**46.** *See (Frank) McFarland,* 845 S.W.2d at 848; *see also Williams v. Cain,* 125 F.3d 269, 276 (5th Cir.1997) (judging counsel's performance through a "highly deferential" lens and with a view to "the facts and resources available to counsel at the time of trial," in concluding that counsel's strategic decisions were based on professionally informed and competent assessment of the information available).

**47.** 928 S.W.2d at 501.

**48.** *King v. State,* 649 S.W.2d 42, 44 (Tex.Crim. App.1983) ("Counsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony"); *see also Sayre v. Anderson,* 238 F.3d 631, 635–36 (5th Cir.2001).

**49.** *See Butler v. State,* 872 S.W.2d 227, 245–46 (Tex.Crim.App.1994) (counsel in capital murder trial was not ineffective for conceding defendant's guilt during closing argument at punishment stage; noting that "[t]rial counsel conceded appellant's guilt as a basis for his argument that, in the eyes of God, two wrongs would not be able to make a right").

**50.** Even if Mr. Benn's closing argument strategy fell below professional norms, it "cannot form the basis of a constitutional ineffective assistance of counsel claim because there is no evidence that [it] prejudiced [applicant] or 'permeated [his] entire trial with obvious unfairness.'" *Martinez v. Dretke,* 404 F.3d 878, 890 (5th Cir., 2005) (quoting *United States v. Jones,* 287 F.3d 325, 331 (5th Cir.2002)).

Clark who might have had some involvement in this case.[51] Second, even if Mr. Benn had once represented Mr. Clark, that representation occurred sixteen months before this capital murder was committed. Finally, and most importantly, Michael Clark did not testify in this case. Therefore, Mr. Benn never had the opportunity to cross-examine him. Any potential conflict never became an actual conflict of interest.[52] Nor does applicant claim that, but for Mr. Benn's earlier representation of Clark, applicant would have called him as a witness.

Applicant has failed to show that his counsel was burdened by any actual conflict of interest and that the conflict had an adverse effect on counsel's performance.[53]

## IV.

■■■■■ The evidence in this case shows that the trial judge recognized that Mr. Benn—although he was clearly the sole attorney applicant wanted—was elderly and unprepared to try a capital murder case. The trial judge was caught between Scylla and Charybdis. On the one hand, he could foresee that Mr. Benn might not provide reasonably competent representation, and, under the Sixth Amendment, a criminal defendant is entitled to competent representation.[54] On the other hand, a criminal defendant also has a Sixth Amendment right to the privately retained counsel of his choice,[55] and a trial judge may not unilaterally remove a defendant's retained attorney without extraordinarily good cause.[56] Thus, the trial judge in this

---

**51.** Michael Clark was never charged with any offense related to this transaction, although he was involved with applicant in other matters.

**52.** *See Routier v. State,* 112 S.W.3d 554, 579–86 (Tex.Crim.App.2003) (lengthy discussion of potential and actual conflicts of interest in context of capital murder prosecution). Here, as in *Routier,* the record does not support applicant's claim that an actual conflict of interest existed. At best, applicant's allegation shows the possibility of a conflict of interest. The showing of a potential conflict of interest does not constitute an actual conflict of interest. *Routier,* 112 S.W.3d at 585–86.

To prove ineffective assistance of counsel based on an actual conflict of interest, the defendant must show (1) defense counsel was burdened by a conflict of interest; and (2) the conflict had an adverse effect on specific instances of counsel's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Monreal v. State,* 947 S.W.2d 559, 564 (Tex.Crim.App. 1997). An actual conflict of interest exists if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests to the detriment of his client's interests. *Monreal,* 947 S.W.2d at 564. When an attorney is unable to cross-examine a government witness or is hindered in such a cross-examination because of a privilege arising from counsel's prior representa-

tion of the witness an actual conflict of interest exists. *United States v. Martinez,* 630 F.2d 361, 362 (5th Cir.1980).

**53.** *See Mickens v. Taylor,* 535 U.S. 162, 171–74, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (citing *Cuyler v. Sullivan,* 446 U.S. at 348–50, 100 S.Ct. 1708).

**54.** *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052.

**55.** *Wheat v. United States,* 486 U.S. 153, 158–59, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (Sixth Amendment affords criminal defendants the right of counsel and, absent a conflict of interest or similar ethical problem necessitating disqualification, the right to privately retained counsel of their own choosing); *Ex parte Prejean,* 625 S.W.2d 731, 733 (Tex.Crim.App.1981) (mandamus relief granted when trial judge in capital murder case disqualified retained counsel for a conflict of interest that defendant had explicitly waived; stating that "freedom of choice in the selection of counsel by the accused" is guaranteed by both the federal and state constitutions as well as by Texas statute).

**56.** *See Stearnes v. Clinton,* 780 S.W.2d 216, 220 (Tex.Crim.App.1989) (trial courts do not have "inherent power" to disqualify defense counsel of choice).

case did his best to satisfy both of these constitutional requirements: he appointed an experienced and competent co-counsel to assist Mr. Benn and take over as necessary.

■ We conclude that, although one of his attorneys slept through portions of the trial, applicant was not deprived of the assistance of counsel under the Sixth Amendment because his second attorney was present and an active advocate at all times. Furthermore, applicant has failed to establish that he received ineffective assistance of counsel which deprived him of his Sixth Amendment right to. a fair trial. We therefore deny relief.

WOMACK, J., filed a concurring opinion, joined by KELLER, P.J., and JOHNSON, J.

WOMACK, J., filed a concurring opinion in which KELLER, P.J., and JOHNSON, J., joined.

In addition to the reasons for denying relief that the Court gives in its opinion, which I join, I wish to add another: The applicant waived, at trial, the complaint that he brings today.

As the Court's account says, the applicant chose and hired an attorney (*ante*, at 750), spurned the trial court's efforts to give him the assistance of another attorney (*ante*, at 750) or to let him change attorneys (*ante*, at 751). He insisted on going to trial with the counsel of his choice. This was his right, which the trial court could not have denied him.

The careful trial court, seeing that the applicant had chosen poorly, provided him with the assistance of a qualified attorney at the public's expense.

When it was obvious that his chosen counsel fell asleep during trial (*see ante*, at 751), the trial court asked the applicant if he wanted to have the trial continue in the charge of a capable attorney (again, at public expense). The applicant refused. (*Ante*, at 751, n. 9.)

Having resisted the efforts of the trial court to give him the effective assistance of counsel, and having knowingly exercised his right to continue being represented by a lawyer who slept rather than a capable lawyer, the applicant may not now complain about his choice.