

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00419-CR

———————————————

BRANDON DESHAWN HUMES, Appellant

V.

THE STATE OF TEXAS

———————————————

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1483296D

———————————————

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Memorandum Opinion by Justice Pittman

# MEMORANDUM OPINION

A jury convicted Appellant Brandon Deshawn Humes of murdering Jane,[1] the mother of his child, and assessed his punishment at fifty-five years' confinement. The trial court sentenced him accordingly. In two issues, Appellant contends:

- The evidence is insufficient to show that he intentionally or knowingly murdered Jane or that he intended to cause her serious bodily injury (Issue Two); and

- He received ineffective assistance of counsel from his trial counsel (Trial Counsel) (Issue One).

Because we hold that the evidence is sufficient to support Appellant's murder conviction and that he failed to satisfy his burden to prove ineffective assistance of Trial Counsel, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

## I. Appellant and Jane Fought After He Found Evidence that She Was Cheating on Him.

Appellant and Jane began dating while Jane was pregnant with her daughter Kate, and later they had a daughter, Amy, together. On the morning of December 10, 2016, when Kate was four years old and Amy was one year old, Appellant and Jane got into a heated argument, apparently because he discovered evidence on her cell phone that she had been cheating on him. At the time, they were living in Fort Worth

---

[1]We use aliases to refer to the decedent, her children, and select witnesses to protect the identities of minors. *See* Tex. R. App. P. 9.10(a); *Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *Wilson v. State*, 442 S.W.3d 779, 782 n.1 (Tex. App.—Fort Worth 2014, pet. ref'd).

with Appellant's stepmother Tonya, and several other extended family members were staying in the home as well. The couple's argument occurred in their upstairs bedroom.

Jane spoke with her mother on the phone two different times that morning and told her she was packing to move back to San Antonio.

## II. After the Initial Argument, Appellant, Who Owned a Gun, Told a Family Member that He Should Have Shot Jane.

Appellant left the house with Tonya's niece Leeanna and her husband Robert to run errands and to "cool down" after his first argument with Jane that day. Meanwhile, Jane discussed the argument with other inhabitants of the house. Jane told Tonya's daughter Tammy that:

- Appellant had seen photos of Jane with another man and texts she had exchanged with that man;

- During the argument, Appellant had thrown her into a wall and choked her;

- Her ribs hurt; and

- Jane was afraid Appellant was suicidal.

During the car ride with Robert and Appellant, Leanna learned that Jane had been cheating on Appellant, and Appellant stated, "I should have shot her." Leeanna took the statement seriously but did not think that the threat was genuine, even though she knew Appellant owned a gun that he used in his job. She noted that Appellant and Jane continued to communicate by phone while he was in the car.

3

About twenty to thirty minutes after they left Tonya's house, Robert and Leeanna returned to the house and dropped off Appellant.

**III.    Appellant and Jane Argued Again, Jane Was Shot, and Appellant Fled the House with His Gun.**

When Appellant returned to the house, he went to the kitchen and then back upstairs to the bedroom he shared with Jane. Katrina, a young, teenaged relative who was also staying with Tonya and who had heard the first argument, testified that Appellant still looked mad but was also calm. However, Tonya's daughter Tammy testified that she had never seen him that mad before. Appellant and Jane began arguing again in their bedroom.

Katrina went upstairs to ask Jane if she could have some of Jane's pizza rolls. Katrina knocked on the bedroom door and opened it slightly to voice her request. Jane said, "[Y]es." As Katrina was going back downstairs, she heard a "pow," and she and Tammy both heard Jane scream. Katrina turned around when she heard the noise and saw Appellant leaving the couple's bedroom. Katrina testified that Appellant was in "[b]east mode"; she had "never seen [anything] like that." On cross-examination, she explained that he "was like heated, mad and . . . like the devil came out of him." Katrina went into the room and found Jane lying on her back on the bed, bleeding and nonresponsive. Jane's two young daughters—the only other people in the room—were in a corner.

Appellant ran downstairs and left in his car, and someone in the house called

4

911 to report the shooting. Tonya called Leeanna, who had been gone from the house only a few minutes, and said, "[Appellant] done killed this girl."

When Appellant drove away from Tonya's house, her daughter Tammy followed him in her car. He stopped at a pond nearby, and she saw his gun in his hand. Tammy then followed Appellant to their old neighborhood, and when he stopped, she saw the gun in the passenger seat. At some point during this journey, they talked, and Tammy learned that Jane had been injured. After their talk, they both drove back to Tonya's house.

## IV. Appellant Was Arrested, and the Police Recovered His Gun and Ammunition.

By the time Appellant returned to Tonya's house after the shooting, the police were there. Fort Worth Police Department (FWPD) Officer G. Reynolds approached Appellant's car and asked if he had the gun. Appellant told him it was in the floorboard; Officer Reynolds saw the gun and then arrested Appellant. After Appellant's first interview with police, they released him, and at his request, they transported him to a local hospital for a mental health evaluation.

FWPD Crime Scene Officer Jessica Wright recovered the gun and a magazine containing eight bullets from under the front passenger seat of Appellant's car; the magazine could hold up to ten bullets. She found a gun belt and two more magazines of ten bullets each in the couple's bedroom closet and a live round on a television cabinet at the foot of their bed.

5

**V.  The Forensic Evidence Showed that Jane Had Been Shot at Close Range with Appellant's Gun.**

Officer Wright photographed the bedroom where the shooting had occurred. Jane's body, which had an obvious head wound, lay face-up in the center of the bed, with her head near the top of the bed and her left foot near the foot of the bed and therefore visible from the hall. The couple's torn-up marriage license lay on the bed to the right of Jane's body. No blood or spatter was visible on Jane's hands. Officer Wright found two bullet fragments to the left of the body—a "majority of the projectile" at the top left corner of the bed and a smaller fragment on the carpet to the left of the bed. After the body was removed from the bed, Officer Wright could see a lot of blood and a spent casing that had been lying underneath the body.

Tarrant County Deputy Medical Examiner Dr. Susan Roe concluded that a bullet had entered behind Jane's left ear at the "junction of the ear and the . . . skull," and although a fragment of the bullet remained inside Jane's brain until the autopsy, most of the bullet had exited her body from the right eyebrow area. Dr. Roe found no rib injuries or evidence of choking. She determined that Jane had died from a gunshot wound to her head and that her manner of death was homicide at the hands of another. Dr. Roe clarified that had she believed Jane's death was an accident or a suicide, she could have so ruled.

Jamie Becker, a firearm and toolmark examiner for the Tarrant County Medical Examiner's Office, tested the casing, bullet fragments, and Appellant's gun and

6

determined that two of the bullet fragments and casing were fired from Appellant's gun; the remaining fragment did not have enough characteristics from the firing process for comparison.

Becker, Dr. Roe, and Officer Wright all agreed that the gunshot occurred at close range, with Becker opining that at the time of firing, the gun's muzzle had been less than three inches from the entry point behind Jane's left ear and Dr. Roe concluding that the muzzle had made partial contact with Jane's skin at the time of firing.

## VI. Gunshot Residue (GSR) Was Found on Both Appellant and Jane.

On the day Jane died, FWPD Crime Scene Officer Cliff Hankins collected samples from Appellant's hands and face for GSR testing, and four months later, Officer Hankins collected a sample for GSR testing of the clothes Appellant had worn on the day Jane died. Vicki Hall, a senior trace analyst of the Tarrant County Medical Examiner's Office and Forensic Laboratory, analyzed samples from Jane's hands, Appellant's hands, his face, and his clothes for GSR. Hall found GSR on both Appellant's and Jane's hands. Hall testified that "it's not unusual for a shooting victim . . . to have residue on their hands from just being in that environment, having their hands in the environment of a discharging firearm. They may have fired the gun themselves, or they may have just been in close proximity." She concluded that the presence of the GSR indicated that Appellant and Jane either fired the gun, touched it or something that had GSR on it, or were nearby when the gun was discharged.

There was no evidence whether Jane was left-handed, right-handed, or ambidextrous.

## VII. Jane's Blood Was Found on the Gun.

Even though no blood was found on Jane's hands, her blood was found on the gun's slide.

## DISCUSSION

## I. The Evidence Is Sufficient to Show that Appellant Intentionally or Knowingly Murdered Jane or Intended to Cause Her Serious Bodily Injury.

In his second issue, Appellant contends that the evidence is insufficient to show that he intentionally or knowingly killed Jane or intended to cause her serious bodily injury.

### A. We Review the Evidence in the Light Most Favorable to the Verdict.

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Although motive and opportunity are not elements of a criminal offense, they can be circumstances that indicate guilt; therefore, we may properly consider them in our sufficiency review. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). "Having the opportunity to murder someone and then fleeing the crime scene is a circumstance of guilt."

9

*Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018).

We must scrutinize circumstantial evidence of intent as we do evidence of other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). We may infer intent from a defendant's words and behavior. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

## B. Appellant Was Indicted and Tried on Two Theories of Murder.

Section 19.02(b) of the Texas Penal Code provides that a person commits murder if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Tex. Penal Code Ann. § 19.02(b). Appellant was indicted for murder under the first two theories. *See id.* § 19.02(b)(1)–(2). Specifically, the indictment charged that (1) he intentionally or knowingly caused Jane's death by shooting her with a firearm; and (2) with intent to cause Jane serious bodily injury, he intentionally committed an act clearly dangerous to human life—shooting her with a firearm—that caused her death.

## C. Sufficient Evidence Supports the Jury's Guilty Verdict.

In his entire analysis of the law to the facts in this issue, Appellant contends:

> There is no clear evidence to show that [Appellant] intended to kill Jane or that he intended to cause her serious bodily injury. The gunshot wound to Jane was on the left side at the back of her head and the exit wound was through her right eyebrow which is consistent with the gun being held side-ways. The gun residue was clearly shown on both Jane's and [Appellant's] hands. The presence of gunshot residue particles indicates that both [Appellant] and Jane, either . . . fired or discharged the firearm, handled a firearm or a firearm component that has residue on it, or that they were in close proximity at the time of the discharge.
>
> Furthermore, the medical examiner indicated that she could not tell who possessed the gun. She also indicated that they both could have been in the possession of the weapon.

Appellant therefore appears to challenge the sufficiency of the evidence that he was the shooter as well as the evidence of his intent.

Reviewing all the evidence, not just the forensic evidence, and deferring to the jury's resolution of any conflicts in the evidence in favor of its verdict, we hold that the evidence is sufficient to support Appellant's conviction. *First*, in the car ride between his two arguments with Jane, Appellant told Leeanna that he should have shot Jane. *Second*, Jane was shot with Appellant's gun, and her blood was on the gun but not on her hands. *Third*, Appellant fled the scene after the shooting, and he took his gun with him. *Fourth*, Appellant was angry with Jane, even after the car ride he took to "cool down" following their first argument, and when his relative Katrina saw him exit the couple's bedroom directly after the shooting, he was in "[b]east mode"; "like heated, mad and . . . like the devil came out of him." *Fifth*, the only people in the bedroom when Jane was shot were Appellant, Jane, four-year-old Kate, and one-year-

11

old Amy.

By convicting Appellant, the jury rejected any inference that Jane had shot herself, and we defer to that resolution. *See Murray*, 457 S.W.3d at 448–49. Also, Appellant's statement that he should have shot Jane, his anger and angry demeanor, the GSR on his hands, and his fleeing the crime scene with his gun that had killed Jane suffice to prove his intent beyond a reasonable doubt, and all the evidence, viewed in a light favorable to the verdict, sufficiently supports the elements of murder beyond a reasonable doubt. *See id.*; *see also* Tex. Penal Code Ann. § 19.02(b)(1)–(2); *see, e.g.*, *Payne v. State*, No. 06-16-00034-CR, 2017 WL 1534012, at *12–13 (Tex. App.—Texarkana Apr. 28, 2017, pet. ref'd) (mem. op., not designated for publication) (deferring to jury's rejection of suicide and relying in part on evidence of opportunity and recent argument in holding evidence sufficient to satisfy elements of capital murder). We overrule Appellant's second issue.

## II. Appellant Did Not Prove His Claim of Ineffective Assistance of Trial Counsel.

In his first issue, Appellant contends that Trial Counsel rendered ineffective assistance by failing (1) to dispute the State's forensic evidence during the guilt-innocence phase; (2) to introduce evidence of sudden passion during the punishment phase; and (3) to fully inform Appellant of the consequences of not testifying during the punishment phase.

**A.** **Appellant Must Prove by a Preponderance of the Evidence Both Deficient Representation by Trial Counsel and a Reasonable Probability that Without It, His Trial's Outcome Would Have Been Different.**

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear

record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have

been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

### B. Appellant Does Not Show that He Would Have Benefitted from Additional Evidence or Further Cross-Examination.

Appellant complains that Trial Counsel did not put on a case for the defense during the guilt-innocence phase and that he did not put on sudden-passion evidence during the punishment phase. The Texas Court of Criminal Appeals has held that "[c]ounsel's failure to call witnesses at the guilt-innocence and punishments stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). This court has followed that binding precedent. *See Gomez v. State*, 552 S.W.3d 422, 435–36 (Tex. App.—Fort Worth 2018, no pet.).

Appellant contends that Trial Counsel made no effort to sponsor a trace-evidence expert to dispute testimony, but Appellant does not show proof in the record that a trace-evidence expert would dispute the State's evidence or that he would have benefitted from a trace-evidence expert's testimony.

Appellant further contends that Trial Counsel failed to put on evidence supporting a sudden-passion mitigation theory—testimony Appellant claims only he could provide, along with his post-arrest mental health records—during the punishment phase. *See* Tex. Penal Code Ann. § 19.02(d). However,

> That sudden passion is a subjective concept does not . . . necessitate that there be direct evidence of the defendant's state of mind. Indeed, such

> direct evidence is neither needed nor usually available. Rather, because sudden passion is essentially a culpable mental state, it may be inferred from the acts of the accused and the circumstances under which those actions occur.

*Trevino v. State*, 60 S.W.3d 188, 194 (Tex. App.—Fort Worth 2001) (footnotes omitted) (relying in part on *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998)), *aff'd*, 100 S.W.3d 232 (Tex. Crim. App. 2003). Before the State rested its punishment case, the trial court admitted all evidence from the guilt-innocence phase, which included testimony of those who were with Appellant before and after the shooting. Appellant did not file a motion for new trial alleging ineffective assistance of Trial Counsel and obtain an evidentiary hearing thereon. He therefore fails to provide any proof in the record that his own testimony or his post-arrest mental health records would have affected the jury's rejection of his sudden-passion claim.

Similarly, Appellant contends that Trial Counsel neither explored through cross-examination the theory that Jane could have shot herself with her left hand nor attacked the evidence (through cross-examination or objection) that Jane may have been pinned down when she was shot. The record is silent regarding Trial Counsel's decision not to explore these areas.

"Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005). Further, Trial Counsel cannot be deficient for failing to object unless the trial court would have

16

abused its discretion by overruling the objection. *Prine v. State*, 537 S.W.3d 113, 117–18 (Tex. Crim. App. 2017); *cf. State v. Gutierrez*, 541 S.W.3d 91, 99–103 (Tex. Crim. App. 2017) (concluding that the defendant could not show prejudice because the record did not show that the trial judge would likely have granted a mistrial when defendant thought his counsel should have requested it and because the trial judge would not have erred by denying a mistrial motion). The record does not show that the trial court would have likely sustained an objection to the testimony that Jane may have been pinned down when she was shot, nor does Appellant make any attempt to convince us that the trial court would have abused its discretion by overruling such an objection.

We reject these complaints.

### C. Appellant Does Not Show that Trial Counsel Failed to Fully Inform Him of His Right to Testify.

In conjunction with Appellant's complaint that Trial Counsel committed ineffective assistance by failing to offer evidence of sudden passion during the punishment phase to mitigate Appellant's sentence, Appellant also complains that Trial Counsel was ineffective in not fully informing him of the impact his failure to testify during the punishment phase would have on his mitigation theory of sudden passion. "[D]efense counsel shoulders the primary responsibility to inform the defendant of his right to testify, including the fact that the ultimate decision belongs to the defendant," *Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005), and

"may advise him on the advantages and disadvantages of testifying." *Soliz v. State*, No. 04-10-00087-CR, 2011 WL 193469, at *5 (Tex. App.—San Antonio Jan. 19, 2011, no pet.) (mem. op., not designated for publication). "[A] claim that trial counsel deprived the defendant of his right to testify must be supported by evidence in the record that the defendant would have testified, and of what the defendant would have said." *Dukes v. State*, 486 S.W.3d 170, 182 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (op. on reh'g).

The record shows that Appellant made the decision not to testify. Because Appellant did not file a motion for new trial based on his claim of ineffective assistance of Trial Counsel and obtain a hearing on the record, the record does not support Appellant's claim that Trial Counsel did not fully inform him of the law on sudden passion or of the potential effects not testifying could have on the success of that theory. The record also does not disclose that Appellant would have testified even if he had believed it was necessary to convince the jury that he killed Jane in a sudden passion or what Appellant's testimony would have been had he testified. Absent such evidence in the record, Appellant cannot satisfy his burden to show that Trial Counsel's performance was deficient or, even if it was, that Appellant's testifying during the punishment phase would have altered the jury's verdict. *See Dukes*, 486 S.W.3d at 182.

We overrule Appellant's first issue.

## <u>CONCLUSION</u>

Having overruled Appellant's two issues, we affirm the trial court's judgment.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 14, 2019