Opinion issued March 6, 2008 





 



 










In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00738-CR

____________


SAMUEL PURCHASE, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 337th District Court

Harris County, Texas

Trial Court Cause No. 768286-E






MEMORANDUM OPINION

 A jury found appellant, Samuel Purchase, guilty of the offense of felony theft (1)
and assessed his punishment at confinement for four years. The trial court suspended
the sentence, placed appellant on community supervision for four years, imposed a
fine of $1,500, and ordered appellant to serve sixty days of confinement as a
condition of his community supervision and pay the Southwest Resource Credit
Union (the "credit union") $40,028.75 in restitution. We affirmed his conviction in
Purchase v. State, 84 S.W.3d 696 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd). (2)

 Appellant filed in the trial court an application for a writ of habeas corpus, (3)
which the trial court denied. Appellant raises seven issues on appeal. In his first five
issues, appellant contends that the trial court erred in denying his application for a
writ of habeas corpus as the State, in the underlying proceeding, in violation of the
Fourteenth Amendment, (4) utilized a pretrial identification which led to an "irreparable
misidentification" of him, suppressed or failed to disclose exculpatory or
impeachment evidence to him, committed prosecutorial misconduct, used its
peremptory strikes based on the veniremembers' race, and the cumulative error at trial
denied him a fair trial. In his sixth and seventh issues, appellant contends that his
trial counsel rendered ineffective assistance and his appellate counsel rendered
ineffective assistance.

 We affirm. 

Factual Background

 In the underlying trial, Donna DuPont, the complainant, a collection manager
at the credit union, testified that, on October 9, 1997, a man purporting to be "Steve
Jones," an Exxon employee, opened a checking account with the credit union. 
DuPont explained that, because Exxon was the credit union's parent company, the
credit union automatically honored all Exxon checks. From October 9, 1997, until
the complainant closed the account on October 22, 1997, "Jones" had deposited ten
Exxon Chemical checks, which had a cumulative face value of approximately
$44,000, and withdrawn $40,000 from the account. After discovering that the checks
were counterfeit on October 22, 1997, and then completing an investigation, the
complainant learned that "Jones" was not the true owner of the account. The
complainant explained that the credit union's surveillance camera took eight
photographs of the man purporting to be "Jones." Introduced as State's exhibits 3
through 10, the photographs depicted an African-American male conducting various
banking transactions from October 10, 1997 through October 14, 1997. She noted
that, by comparing the time that the surveillance camera took the photographs with
the time of various banking transactions on "Jones's" account, one could conclude
the photographs were of "Jones." On October 10, 1997, at 11:08 a.m., "Jones" made
a withdrawal from his account at the credit union, located at 2900 Decker Drive,
along with a deposit shortly thereafter. (5) State's exhibits 3 and 4 depicted the African-American male conducting a banking transaction at 11:12 a.m. inside of the credit
union. On October 14, 1997, at 9:20 a.m., "Jones" made a balance inquiry of his
account at the credit union, along with a deposit inside of the credit union shortly
thereafter. State's exhibits 5 through 9 depicted the same African-American male
conducting a banking transaction from 9:20 a.m until 9:22 a.m. at the credit union. 
 Baytown Police Department Detective C. Dougherty testified that, on
November 10, 1997, he showed Mary Lou Hill, a bank teller at the credit union, a
photographic array containing photographs of six African-American males with
similar build, hair, and size. (6) Although Dougherty informed Hill that the array "may
not" include the person that committed the offense, the photographs in the array were
numbered one through six, with a photograph of appellant in the number three
position. 

 When Detective Dougherty initially showed the array to Hill, she could not
make a positive identification. After scrutinizing further, Hill identified the culprit
as either appellant or the man in the first photograph. When the State asked
Dougherty why Hill could not make a positive identification, Dougherty explained
that Hill had told her, "[S]he felt [that] she could make an identification if she could
see the whole person versus just the face." Nonetheless, Dougherty did note that, on
November 11, 1997, Eugene Buehring, a security supervisor for Exxon, identified
appellant as the culprit after looking at the array.

 Buehring testified that, after the complainant discovered that "Steve Jones's"
checks were counterfeit, without telling Buehring of any suspects, the complainant
called him into the complainant's office in order to show him the surveillance
photographs. Buehring explained that, because he worked in security for Exxon and
appellant had been an employee with Exxon, he knew appellant personally. Upon
looking at the photographs, Buehring "instant[ly]" recognized appellant as the
culprit. (7) 

 After Buehring identified appellant in the surveillance photographs, Detective
Dougherty showed him the array, asking him if any person in the array looked similar
to the person he identified from the surveillance photographs, and Buehring identified
appellant as the culprit. On cross-examination, appellant's trial counsel asked
Buehring, "When you looked at [the array], was number three[,] [appellant's
photograph,] circled already at the time it was shown to you?" Buehring replied,
"No." On redirect examination, Buehring explained that, after he identified appellant
as the culprit, Dougherty circled appellant's photograph and Buehring signed his
initials underneath appellant's photograph and inside of the circle.

 Hill testified that, on October 9, 1997, when she was working as a bank teller
at the credit union, appellant, after he had just opened the checking account as "Steve
Jones," approached her to make an initial deposit of $50 into the account. Hill
specifically remembered speaking with appellant while he made this deposit because
she was trying "to get to know" a new member and noticed that appellant was
wearing an Exxon uniform. A few hours later, appellant again approached her and
deposited a check for approximately $4,300 into the account. When the State showed
her the surveillance photographs, Hill, based upon her "recollection of the events,"
identified appellant as the culprit. Thereafter, the State questioned Hill about the
array, asking if anything in the array appeared "suggestive," to which Hill replied,
"No." After the State handed Hill the array, it offered the following testimony: [Hill]: When I looked at the six [photographs], I looked at
them very carefully. I picked two of the gentlemen,
and my response to [Detective Dougherty] was that
the only way I could make a positive identification
was to see the whole body. As a teller, when you're
looking at things, you're looking at body postures;
you're looking at height; you're looking at, you
know, the way they stand, more than just a cropped
part of their head. So I stated to [Dougherty] that if
I saw the person--the whole body--I would be able
to identify him.


[The State]: Is one of the persons that you chose in [the array] in
the courtroom today?


[Hill]: Yes, sir.


[The State]: What number is underneath his [photograph] in [the
array]?


[Hill]: No. 3.


[The State]: Putting this thing aside, putting this down, I want
you to tell the jury if there is somebody in the
courtroom today--if the person in the courtroom
today[,] is the same person who came into the bank
and made a deposit[?]


[Hill]: Yes, sir.


[The State]: Not talking about the [array,] I'm asking you to tell
the jury right now: Looking at him, looking at the
way he's sitting--his appearance, his posture[,]
everything--are you sure that this is the same person
that made those deposits?


[Hill]: Yes, sir. 


 Appellant offered the testimony of Lloyd Dubose, Jr., Gerald Lightfoot, Ken
Mayes, and Jody Whiteside, all Exxon refinery employees who had worked at Exxon
for years with appellant, who testified that the surveillance photographs did not depict
appellant. Also, Dubose and Mayes noted that they had never received a check from
Exxon for $4,000 or more, while Lightfoot stated that a $4,000 check would be
unusually large. Moreover, both Lilly Lewis, appellant's mother-in-law, and Lola
Purchase, appellant's wife, testified that the surveillance photographs did not depict
appellant.

 Mrs. Purchase testified that appellant could not have committed the offense
because on the day that the checking account was opened at the credit union, October
9, 1997, appellant was either with her or at other verified locations. Mrs. Purchase
noted that, although appellant had worked for Exxon refinery in 1996, he quit his job
and was unemployed at the time of the offense. She explained that, because they had
only one car, on October 9, 1997, Mrs. Purchase rode with appellant to drop their
daughter off at school in Baytown before appellant dropped her off at her work at
approximately 8:30 a.m. Appellant then went to their home in La Porte, cooked a
picnic lunch for the two of them, and, at 11:15 a.m., picked Mrs. Purchase up at work
for lunch. After eating, at approximately 12:30 p.m., they went shopping at the
grocery store for their daughter's birthday party. At approximately 1:10 p.m.,
appellant dropped Mrs. Purchase off at work before appellant went to his mother-in-law's house in Baytown in order to set up for their daughter's birthday party. At
approximately 3:15 p.m., appellant picked their daughter up and returned to his
mother-in-law's house until he picked Mrs. Purchase up from work at approximately
6:15 p.m. After appellant picked Mrs. Purchase up, they celebrated their daughter's
birthday. 

 Appellant testified as well that he was not the person depicted in the
surveillance photographs and that he had not even been inside of the credit union for
ten years. He denied ever opening a bank account as "Jones" and making the
accompanying deposits. Appellant's testimony about his whereabouts on October 9,
1997 closely resembled his wife's testimony. However, unlike Mrs. Purchase's
testimony, appellant stated that they withdrew money from the Shell Credit Union at
12:40 p.m. before shopping at the grocery store.


Standard of Review

 In a habeas corpus proceeding, an applicant has the burden to prove his claims
by a preponderance of the evidence. Ex parte Peterson, 117 S.W.3d 804, 818 (Tex.
Crim. App. 2003). In reviewing a trial court's decision to grant or deny habeas
corpus relief, we view the facts in the light most favorable to the trial court's ruling. 
Id. at 819. We afford "'almost total deference to a trial court's determination of the
historical facts that the record supports especially when the trial court's fact findings
are based on an evaluation of credibility and demeanor.'" Id. (quoting Guzman v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). In such instances, we utilize an
abuse of discretion standard. Id. We afford the same amount of deference to the trial
court's ruling on "application of law to fact questions," if the resolution of those
ultimate questions turns on an evaluation of credibility and demeanor. Id. However,
if the resolution of those ultimate questions turns on an application of legal standards
absent any credibility issue, we review the determination de novo. Id.

Claims Not Raised on Direct Appeal 

 In his first through fifth issues, appellant argues that the trial court erred in
denying his application for a writ of habeas corpus because reversible error occurred
in the trial when (1) the trial court did not suppress Hill's in-court identification of
appellant after a pretrial identification procedure which led to "irreparable
misidentification," (2) the State violated due process by suppressing, or failing to
disclose, Brady (8) material, (3) the State committed prosecutorial misconduct, (4) the
State peremptorily struck veniremembers based on race, and (5) cumulative error
denied him a fair trial. The State argues that because appellant did not raise these
issues in his direct appeal, the trial court properly found that appellant cannot raise
these issues for the first time in his application for a writ of habeas corpus. 
 Habeas corpus is an extraordinary remedy and is only available when there is
no other adequate remedy at law. Ex parte Cruzata, 220 S.W.3d 518, 520 (Tex.
Crim. App. 2007). Habeas corpus may not be used to assert matters that could have
been raised on direct appeal. Id.; see also Ex parte Gardner, 959 S.W.2d 189,
198-99 (Tex. Crim. App. 1996) (McCormick, P.J., plurality op.) (concluding that, by
not asserting Fifth Amendment (9) Miranda (10) claim on direct appeal, defendant could
not assert by writ of habeas corpus that "warnings failed to specifically inform
[defendant] that any statements he made could be used against him"). "Even a
constitutional claim is forfeited if the applicant had the opportunity to raise the issue
on appeal." Ex parte Townsend, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004).

 Here, appellant was not prevented from raising these claims in his direct
appeal. See Cruzata, 220 S.W.3d at 520. Thus, "[h]e had an adequate remedy at
law." Townsend, 137 S.W.3d at 81 (holding that, because defendant did not raise
claim on direct appeal, defendant could not raise claim in application for writ of
habeas corpus). Accordingly, appellant may not assert these claims for the first time
in an application for a writ of habeas corpus. See Cruzata, 220 S.W.3d at 520; see
also Greer v. Mitchell, 264 F.3d 663, 682 (6th Cir. 2001) (concluding that defendant
could not assert for first time in habeas corpus action that State struck veniremembers
based on race when defendant did not raise claim in direct appeal); Evans v. State,
946 So. 2d 1, 16 (Fla. 2006) (noting that, because defendant did not raise "cumulative
error" assertion on direct appeal, court could not consider assertion in defendant's
habeas corpus action); Weaver v. State, 562 S.E.2d 183, 184 (Ga. 2002) (refusing to
consider merits in habeas corpus action of defendant's Brady claim because it could
have been raised in direct appeal); Carter v. Galetka, 44 P.3d 626, 632-33 (Utah
2001) (holding that prosecutorial misconduct claim not raised on direct appeal could
not be raised in habeas corpus action); Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va.
1974) (barring defendant's alleged constitutional improper pretrial identification
claim in habeas corpus action because defendant did not raise claim on direct appeal).

 We overrule appellant's first through fifth issues.

Ineffective Assistance of Trial Counsel

 In his sixth issue, appellant argues that his trial counsel rendered ineffective
assistance because his trial counsel's performance "fell far below an objective
standard of reasonableness" and "but for [his trial] counsel[']s unprofessional errors,
the result[] of the proceedings would have been different." 

 In order to prove an ineffective assistance of counsel claim, a defendant must
show that his counsel's performance fell below an objective standard of
reasonableness and, but for his counsel's unprofessional error, there is a reasonable
probability that the result of the proceedings would have been different. Strickland
v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Vasquez v. State,
830 S.W.2d 948, 949 (Tex. Crim. App. 1992). A reasonable probability is a
"probability sufficient to undermine confidence in the outcome." Strickland, 466
U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the
totality of the representation to determine the effectiveness of counsel, indulging a
strong presumption that his performance falls within the wide range of reasonable
professional assistance or trial strategy. Thompson v. State, 9 S.W.3d 808, 813 (Tex.
Crim. App. 1999).

 Trial counsel has the duty "'to make reasonable investigations or to make a
reasonable decision that makes particular investigations unnecessary.'" McFarland
v. State, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996) (quoting Strickland, 466 U.S.
at 691, 104 S. Ct. at 2066). A trial counsel's decision to not investigate "'must be
directly assessed for reasonableness in all the circumstances, applying a heavy
measure of deference to [trial] counsel's judgments.'" Id. (quoting Strickland, 466
U.S. at 691, 104 S. Ct. at 2066). When a defendant has given trial counsel "reason
to believe that pursuing certain investigations would be fruitless or even harmful,
[trial] counsel's failure to pursue those investigations may not later be challenged as
unreasonable." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; see Posey v. State,
763 S.W.2d 872, 877 (Tex. App.--Houston [14th Dist.] 1988, pet. ref'd). 

 Also, an appellate court will not find a trial counsel's performance as
incompetent and unprofessional based on "speculation." Jackson v. State, 877
S.W.2d 768, 771 (Tex. Crim. App. 1994). In fact, when no evidence exists as to why
a trial counsel made a certain decision, "an appellate court 'commonly will assume
a strategic motivation if any can possibly be imagined,' and will not conclude the
challenged conduct constituted deficient performance unless the conduct was so
outrageous that no competent attorney would have engaged in it." Garcia v. State,
57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (citation omitted) (quoting 3 Wayne R.
LaFave et al., Criminal Procedure § 11.10(c), at 717 (2d ed. 1999)). 

 Moreover, when a defendant complains that his trial counsel was ineffective
for failing to call a witness at trial, the defendant must make a preliminary showing
that the witness would have been available to testify at trial and that the witness's
testimony would have been beneficial. Ex parte McFarland, 163 S.W.3d 743, 758
& n.48 (Tex. Crim. App. 2005). Likewise, when a defendant complains that his trial
counsel rendered ineffective assistance by failing to call an expert witness, the
defendant must first show that the expert would have testified in a manner beneficial
to him. See Cate v. State, 124 S.W.3d 922, 927 (Tex. App.--Amarillo 2004, pet.
ref'd); Teixeira v. State, 89 S.W.3d 190, 194 (Tex. App.--Texarkana 2002, pet.
ref'd). Also, before this Court may conclude that appellant's trial counsel rendered
ineffective assistance in failing to object to certain evidence, appellant must show that
the trial court would have committed error in overruling the objection. Ex parte
White, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004).

 At the hearing on appellant's application, appellant's trial counsel, in his
affidavit, testified that he spent "in excess of 100 hours of time" in preparing and
litigating appellant's case. Before trial, he interviewed appellant, Dubose, Lewis,
Lightfoot, Mayes, Mrs. Purchase, and Whiteside. He did not interview the State's
witnesses, Alverado, Buehring, the complainant, or Hill, because appellant insisted
that it was "a waste of time" and that appellant "already knew what they were going
to say." Moreover, although the complainant did state that there were numerous
people involved in the depositing of the checks, trial counsel explained to appellant
that from his past experience, counterfeit-check scams involved at least three people,
and, even though multiple people committed the offense, a coconspirator could still
be found guilty for the entire act. 

 Appellant's trial counsel also explained that appellant told him that the
signatures on the counterfeit checks did not resemble appellant's signature. Thus,
during discovery, trial counsel obtained copies of the signed, counterfeit checks, so
appellant could use them when he employed a handwriting expert's services. Trial
counsel further provided appellant with a familiar handwriting expert, along with a
list of other handwriting experts from the "yellow pages." After trial counsel
explained to appellant the "instrumentality" of obtaining a handwriting expert for his
defense, he still found appellant to be "evasive." Finally, appellant stated to trial
counsel, "[I] [d]idn't like what the handwriting expert had to say." Trial counsel
concluded that if he subpoenaed the handwriting expert, the expert would opine that
the handwriting on the checks was appellant's handwriting. Trial counsel stated that
it was appellant's "decision alone" to not use a handwriting expert's services at trial. 
 Todd Overstreet, the prosecutor at appellant's trial, testified, in his affidavit,
that appellant's trial counsel "raised and argued all reasonable defenses available to
[appellant]." Overstreet also noted that "the possibility that other parties may have
been involved [in the offense] was not inconsistent with [appellant's] guilt in the
underlying case." Overstreet explained that appellant's photograph in the lineup was
"circled by either [Hill] or [Detective Dougherty] at the time that [Hill] initially
identified [appellant]." Overstreet added, "Hill was very firm in her belief [at trial]
that [appellant] was the man who had made the deposit at the credit union." 

 Appellant first argues that his trial counsel was ineffective because he failed
to "interview[] any prosecution or defense witnesses" or conduct "any investigation
at all" before trial. However, the record clearly shows otherwise. Trial counsel
testified that he interviewed seven defense witnesses before trial, all of whom he
presented at trial to support trial counsel's central argument of mistaken identity. All
of these witnesses testified that the credit union's surveillance photographs did not
depict appellant. Dubose, Lightfoot, and Mayes testified that a $4,000 check from
an Exxon refinery employee would be unusual, thereby insinuating to the jury that
appellant did not commit the offense because appellant would know better than to
counterfeit a $4,000 check as a former Exxon refinery employee. Also, trial counsel
presented Mrs. Purchase's testimony as an alibi witness for the day of October 9,
1997, the day that "Steve Jones" opened the account with the credit union. Moreover,
appellant testified that he did not commit the offense. Finally, trial counsel testified
that he spent "in excess of 100 hours" preparing and litigating appellant's case. 

 Second, appellant argues that his trial counsel was ineffective because he failed
to conduct a proper pretrial investigation by not interviewing the complainant, who
stated that "she felt [there were] numerous people involved in the crime." However,
appellant informed his trial counsel that interviewing the State's witnesses was "a
waste of time" and that appellant "already knew what they were going to say." 
Appellant's trial counsel cannot be considered ineffective for merely abiding by
appellant's instructions that interviewing the complainant would be essentially
"fruitless" and "harmful." See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. 

 Third, appellant argues that his trial counsel was ineffective because appellant
"wanted a handwriting analysis to present to the jury," his trial counsel failed to
"secure" a handwriting expert, and the handwriting expert would have explained to
the jury how the signatures on the counterfeit checks were "clearly not [appellant's
signatures]." Trial counsel advised appellant about the "instrumentality" of securing
a handwriting expert and consulted with appellant about obtaining a handwriting
expert's services. However, appellant informed his trial counsel that because he
"[d]idn't like what the handwriting expert had to say," a handwriting expert would
not be testifying at his trial. Trial counsel cannot be declared ineffective for simply
abiding by his client's wishes. See Posey, 763 S.W.2d at 877 ("Trial counsel simply
complied with his client's wishes and cannot be held accountable for [defendant's]
decisions."). Moreover, appellant has clearly failed to demonstrate that a handwriting
expert's testimony would have been beneficial. See Cate, 124 S.W.3d at 927. 

 Fourth, appellant argues that his trial counsel was ineffective because at the
time the culprit was committing the offense, appellant "was twenty miles away at a
different credit union," and, although appellant gave "bank records" to his trial
counsel to prove his whereabouts, his trial counsel never presented the "bank records"
or the "custodian" of the records to testify at trial. Appellant also argues that his trial
counsel was ineffective because, although a person named Lincoln Scrange
committed the "exact" same crime and Scrange "fits the body description of
[appellant]," his trial counsel did not present this evidence to the jury. However,
appellant did not make the necessary preliminary showing that Scrange or a custodian
of bank records at "the different credit union" were available to testify at trial and that
their testimony would have benefitted appellant by proving that he did not commit
the offense. See McFarland, 163 S.W.3d at 758 & n.48. Moreover, the record is
silent as to why appellant's trial counsel did not present records from the other credit
union. To find appellant's trial counsel ineffective on this asserted ground would
require speculation. See Jackson, 877 S.W.2d at 771.

 Finally, appellant argues that his trial counsel was ineffective when he did not
object to or file a motion to suppress Hill's in-court identification of appellant
because the pretrial lineup contained a circle around appellant's face and was so
impermissibly suggestive that it gave rise to a substantial likelihood of irreparable
misidentification at trial by Hill in violation of the Fourteenth Amendment. 

 The Due Process Clause of the Fourteenth Amendment of the United States
Constitution protects an accused from the State admitting into evidence a pretrial
identification if it is "so suggestive and conducive to mistaken identification that
subsequent use of that identification at trial would deny the accused due process of
law." Barley v. State, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). When
challenging the admissibility of a pretrial identification, an accused has the burden
to show, based on the totality of the circumstances and by clear and convincing
evidence, that (1) the pretrial identification procedure was impermissibly suggestive,
and (2) it created a substantial likelihood of irreparable misidentification. Id. Under
the second step, "reliability is the linchpin" in determining the admissibility of
identification testimony. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243,
2253 (1977). 

 Here, Detective Dougherty testified that, on November 10, 1997, he presented
the photographic array to Hill. After Hill did not make a positive identification,
Dougherty showed the array to Buehring. Buehring explained that Dougherty circled
appellant's photograph only after Buehring identified appellant as the culprit. This
was done after Hill had viewed the array. At trial, Hill first identified, in court,
appellant as the culprit based on her recollection of events and from looking at the
surveillance photographs. Then, the State handed her the array with appellant's
photograph circled. Without mentioning the circle, Hill explained that she did not
make an initial, positive identification of appellant because she could not see his
"whole body." The State then asked again if one of the people she initially chose in
the array when she first viewed it with Dougherty was in the courtroom, to which Hill
replied, "Yes, sir." Then, after "[p]utting . . . aside" the array, Hill identified
appellant as the culprit. It is true that, approximately nine years later, on August 24,
2006, at the hearing on appellant's application, Overstreet testified that either
Dougherty or Hill had circled appellant's photograph after Hill identified appellant
as the culprit. Overstreet added that Hill was "firm in her belief" at trial that
appellant committed the offense. However, as noted above, Buehring affirmatively
testified at trial that Dougherty circled appellant's photograph on November 11, 1997,
after Buehring identified appellant as the culprit. This testimony was approximately
one and one-half of a year after he was shown the array. The discrepancy in the
testimony created a factual determination, to which we grant "almost total deference." 
See Peterson, 117 S.W.3d at 819. Viewing the facts in the light most favorable to the
trial court's ruling, the trial court likely chose to believe Buehring's trial testimony,
which was taken approximately one and one-half of a year after he was shown the
array, rather than Overstreet's testimony, which was taken approximately nine years
after the incident. See id. 

 We conclude that the trial court did not err in admitting Hill's in-court
identification of appellant. See Bell v. State, 724 S.W.2d 780, 799 (Tex. Crim. App.
1986) (concluding that, even though appellant was only person in array with bright
white pants, was shortest person in array, and was only person with triangular mark
above his head, trial court did not err in allowing witness's in-court identification of
appellant when it was based on remembering that appellant cashed check at bank and
witness made in-court identification based on bank observations). We also conclude
that appellant's trial counsel was not ineffective for not objecting to Hill's in-court
identification because if his trial counsel had objected to Hill's in-court identification,
the trial court would not have committed error in overruling this objection. See
White, 160 S.W.3d at 53. 

 After considering all of the arguments of appellant regarding the effectiveness
of his trial counsel, we further conclude that appellant has not demonstrated that any
acts or omissions of his trial counsel fell below an objective standard of
reasonableness. Accordingly, we hold that appellant has not satisfied Strickland's
first prong.

 We overrule appellant's sixth issue. 

Ineffective Assistance of Appellate Counsel

 In his seventh issue, appellant argues that his appellate counsel was ineffective
because he chose to "attack [appellant's] competence to stand trial" on appeal and
"never addressed any" of the "constitutional" topics that appellant asserted in his
application for a writ of habeas corpus. 

 The Sixth Amendment entitles a defendant to effective assistance of appellate
counsel when pursuing a first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 396,
105 S. Ct. 830, 836 (1985); Williams v. State, 946 S.W.2d 886, 903 (Tex.
App.--Waco 1997, no pet.). Similar to an ineffective assistance of trial counsel
claim, a defendant asserting that his appellate counsel was ineffective for not raising
particular points of error on appeal must satisfy the standard set out in Strickland. 
Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000) (citing Strickland,
466 U.S. at 687-91, 694, 104 S. Ct. at 2064-68); see Ex parte Santana, 227 S.W.3d
700, 704 (Tex. Crim. App. 2007). Thus, the defendant must show that appellate
counsel's decision not to raise a particular point of error fell below an objective
standard of reasonableness and, but for his appellate counsel's failure to raise that
issue, there is a reasonable probability that the result of the proceedings would have
been different. Santana, 227 S.W.3d at 705; see Robbins, 528 U.S. at 285-86, 120
S. Ct. at 764 (citing Strickland, 466 U.S. at 687-91, 694, 104 S. Ct. at 2064-68).

 Appellate counsel does not have to raise every claim on appeal; rather,
appellate counsel should "examine the record with a view to selecting the most
promising issues for review." Jones v. Barnes, 463 U.S. 745, 752, 103 S. Ct. 3308,
3313 (1983). As the United States Supreme Court reasoned,

Experienced advocates since time beyond memory have emphasized the
importance of winnowing out weaker arguments on appeal and focusing
on one central issue if possible, or at most on a few key issues. . . . 
"Usually, . . . if you cannot win on a few major points, the others are not
likely to help . . . ." This has assumed a greater importance in an era
when oral argument is strictly limited in most courts--often to as little
as 15 minutes--and when page limits on briefs are widely imposed. . . . 
For judges to second-guess reasonable professional judgments and
impose on [appellate] counsel a duty to raise every "colorable" claim
suggested by a client would disserve the very goal of vigorous and
effective advocacy.


Id. at 751-54, 103 S. Ct. at 3313-14 (emphasis added) (quoting Robert L. Stern,
Appellate Practice in the United States 266 (1981)). Consequently, "'only
when ignored issues are clearly stronger than those presented, will the presumption
of effective assistance of counsel be overcome.'" Robbins, 528 U.S. at 288, 120 S.
Ct. at 765 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)). Thus,
appellate counsel has been found ineffective when appellate counsel failed to raise
a jury-selection error that, under the prevailing case law at that time, would have been
automatic reversible error. Ex parte Daigle, 848 S.W.2d 691, 692 (Tex. Crim. App.
1993).

 The fact that another attorney may have pursued a different course of action on
appeal does not necessarily indicate ineffective assistance. Curry v. State, 91 S.W.3d
360, 362 (Tex. App.--Texarkana 2002, no pet.). When there is no evidence as to
why appellate counsel failed to bring a particular point of error, as here, we may only
conclude that appellate counsel's performance fell below an objective standard of
reasonableness if no reasonable attorney would have failed to raise that issue. Ex
parte Balderrama, 214 S.W.3d 530, 536 (Tex. App.--Austin 2006, pet. ref'd). An
appellate court can evaluate appellate counsel's choice of issues by comparing
significant issues which could have been raised with those which were raised and
examining the trial record and the appellate brief. Gray, 800 F.2d at 646.

 Here, appellate counsel represented appellant at his motion for new trial
hearing and on appeal. At appellant's motion for new trial hearing, appellate counsel
presented appellant and six other witnesses in support of appellant's assertion that he
was incompetent to stand trial, while the State presented one witness, appellant's trial
counsel. In his brief, appellate counsel effectively presented four issues, arguing that
(1) the trial court erred in not conducting a retrospective hearing on appellant's
competence to stand trial, (2) the trial court erred in denying appellant's motion for
new trial, (3) trial counsel was ineffective for failing to ask appellant about his
psychiatric history, and (4) the Texas Court of Criminal Appeals's interpretation of
repealed article 46.02 of the Texas Code of Criminal Procedure, (11) which governed
how the issue of incompetency to stand trial could be raised, was unconstitutionally
vague. Appellate counsel noted that Dr. Rukshan Azhar, a licensed psychiatrist,
testified at appellant's motion for new trial hearing that he had diagnosed appellant
with "adjustment disorder with depressed mood anxiety symptoms" before trial and
he had prescribed Paxil, an antidepressant, to appellant before trial. Appellate
counsel also noted that appellant, at his motion for new trial hearing, testified that he
was not taking Paxil at the time of trial and how Dr. Azhar testified, "Without the
medication, it could affect [appellant's] concentration and thinking ability." 
Therefore, appellate counsel concluded that appellant was incompetent to stand trial
because appellant was "incapable of consulting with his trial [counsel]." Moreover,
appellant's trial counsel conceded that he did not know that appellant was taking an
antidepressant. 

 We cannot fault appellate counsel for "winnowing out" other arguments now
made by appellant and "focusing on one central issue," i.e., appellant's competency
to stand trial. See Jones, 463 U.S. at 751, 103 S. Ct. at 3313. We conclude that
appellant has not demonstrated that his appellate counsel's decision not to raise the
issues now presented by appellant fell below an objective standard of reasonableness. 
Accordingly, we hold that appellant has not satisfied Strickland's first prong.

 We overrule appellant's seventh issue.

Conclusion

 We affirm the order of the trial court.

 




 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.


Do not publish. Tex. R. App. P. 47.2(b). 
1. See Tex. Penal Code Ann. § 31.03(e)(5) (Vernon Supp. 2007).
2. Appellant subsequently filed in the trial court an application for a writ of habeas
corpus, basing his right to relief on Texas Constitution article V, section 8 and Texas
Code of Criminal Procedure article 11.01. See Tex. Const. art. V, § 8; Tex. Code
Crim. Proc. Ann. art. 11.01 (Vernon 2005). The trial court denied his application,
and appellant appealed. We dismissed appellant's appeal because we lacked
jurisdiction. See Purchase v. State, 176 S.W.3d 406 (Tex. App.--Houston [1st Dist.]
2004, no pet.).
3. See Tex. Code Crim. Proc. Ann. art. 11.072 (Vernon 2005).
4. See U.S. Const. amend. XIV, § 1.
5. The credit union's banking statements only note the exact time of a banking inquiry
or a withdrawal, not the exact time of a deposit.
6. Detective Dougherty testified that the lineup was not suggestive.
7. Jerry Alverado, an Exxon security supervisor, testified that, after Buehring showed
him the surveillance photographs, it "[d]idn't take [him] any time" to recognize
appellant as the culprit. 
8. See Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).
9. See U.S. Const. amend. V.
10. See Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630 (1966).
11. See Act of May 23, 2001, 77th Leg., R.S., ch. 829, § 3, art. 46.02, 2001 Tex. Gen.
Laws 1650, 1652, repealed by Act of Apr. 30, 2003, 78th Leg., R.S., ch. 35, § 15,
2003 Tex. Gen. Laws 57, 72.