**Opinion issued August 15, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00578-CR

————————————

**BERNELL PITTS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1597722**

---

## MEMORANDUM OPINION

A jury convicted appellant Bernell Pitts of the first-degree felony offense of continuous sexual abuse of a young child and sentenced him to life imprisonment.[1]

On appeal, Pitts raises four issues: (1) his trial counsel provided ineffective

---

[1] *See* TEX. PENAL CODE §§ 21.02(b), (h), 12.32(a).

assistance by rejecting the trial court's offer of a continuance when the State called a surprise witness; failing to offer any evidence during the punishment phase of trial; and failing to object to jury charge error during the guilt-innocence phase of trial; (2) the trial court erred by admitting extraneous offense evidence which violated his constitutional rights to due process and due course of law; (3) the trial court erred by admitting extraneous offense evidence which was unfairly prejudicial under Rule of Evidence 403; and (4) the guilt-innocence jury charge was erroneous because it authorized a conviction based on two or more sexual assaults that were not separated by the statutorily required thirty-day time period. We affirm.

## Background

Pitts was convicted of continuously sexually abusing C.P. ("Camilla"), Pitts' biological daughter, before she turned fourteen years of age.[2] Evidence admitted at trial showed that Pitts also sexually abused two other girls, M.W. ("Maria") and A.A. ("Alice"), multiple times before they turned fourteen.

Prior to his arrest for the underlying offense, Pitts lived with his long-time girlfriend S.W. ("Stella"), Camilla, and Camilla's brother in Houston. Stella is not Camilla's biological mother. However, they have lived together since Camilla was a few months old, and they have a mother-daughter relationship. Stella has two adult

---

[2] We use pseudonyms to refer to the minor complainant and her family members other than Pitts to protect their privacy. *See* TEX. R. APP. P. 9.10(a)(3), (b).

biological daughters, E.W. ("Emma") and J.W. ("Jade"). Emma and Jade lived nearby and had close relationships with Stella and Camilla.

Alice is Jade's daughter and Camilla's niece. She is two-and-a-half years younger than Camilla and often slept overnight at Camilla's house. Maria is Camilla's cousin through Stella's side of the family. She is one-and-a-half years younger than Camilla. Maria lived in Arlington, but she spent summers in Houston with her grandmother, who is Stella's sister. While staying in Houston, Maria would spend several nights at Camilla's house. Camilla, Maria, and Alice—who were all similar in age—had a close relationship, and the family called Camilla and Maria "twins."

On February 3, 2018, Jade discovered pornography on then-twelve-year-old Alice's phone. When Jade confronted Alice about it, Alice told her that Pitts allowed her and Camilla to watch it. Alice also said that Pitts would play a game of pulling down her pants, which made her feel uncomfortable. Jade called Emma and told her about finding pornography on Alice's phone, and they went to Stella's house to confront Pitts. Pitts, Stella, and Camilla were home when Jade and Emma arrived, but Pitts refused to leave the bedroom and discuss the allegations.

Camilla initially denied any knowledge of the pornography. But just before Emma left, Camilla ran to her "[l]ike she was having a nervous breakdown, scared, asking [Emma] not to leave her there." Camilla told Emma that Pitts had been

"touching" her, which she described as sexual intercourse. Camilla reported that Pitts was on a schedule: he would have sex with her before taking her to school and after picking her up from school. She also told Emma that Pitts had sexual intercourse with her that afternoon before everyone arrived at the house.

Emma called the police, but Pitts fled the house before police arrived. Camilla reported to the police that Pitts had sexually assaulted her, including that same day. Camilla also reported that after sexually assaulting her that day, Pitts ejaculated onto his white t-shirt. Police found the t-shirt in a clothes hamper and confiscated it for DNA evidence.

Paramedics took Camilla to Texas Children's Hospital, where she underwent a sexual assault examination. Camilla told the examining nurse that Pitts had been sexually assaulting her up to three times per night. She also said that Pitts believed he and Camilla were in a dating relationship. Camilla did not have any serious injury, but she tested positive for two sexually transmitted infections. Camilla had two follow-up examinations at the Children's Assessment Center.

A Houston police officer filed a complaint against Pitts. According to the complaint, Pitts had continuously sexually abused Camilla by having vaginal and anal intercourse with her between May 13, 2016, and May 13, 2017. The sexual abuse began when Camilla was twelve years old and continued until after she turned fourteen. The complaint also alleged that Pitts had sexually abused Maria and that

4

he had tried unsuccessfully to persuade Camilla to have sex with Maria. A Harris County grand jury indicted Pitts for the first-degree felony offense of continuous sexual abuse of a young child. *See* TEX. PENAL CODE § 21.02(b), (h).

During a pretrial hearing following voir dire, the State announced its intent to call Maria and Alice as witnesses to testify about uncharged allegations of sexual abuse by Pitts against them. Defense counsel objected to admission of their testimony on the ground that the State had not provided proper notice of these witnesses. Counsel eventually acknowledged, however, that the State had filed pretrial notices of its intent to call both Maria and Alice as witnesses. The trial court overruled the objection. Defense counsel also objected that the testimony was inadmissible under Code of Criminal Procedure article 38.37, but the trial court overruled that objection as well. When Alice later testified at trial, defense counsel reurged the prior objections to her testimony, and the trial court again overruled the objections. Defense counsel obtained a running objection. When Maria later testified, however, counsel did not renew the objections to her testimony or obtain a running objection.

Numerous witnesses testified at trial, including Stella, Emma, Camilla, Maria, and Alice. Stella testified that she, Pitts, Camilla, and Camilla's brother lived in a house on Huntington Valley in Houston from 2014—when Camilla was ten or eleven years old—until 2016 or 2017, when the family moved to a house on West

5

Airport. As discussed below, Camilla testified that Pitts had sexual intercourse with her repeatedly at both houses. Stella testified that Camilla's behavior changed in 2016 when Camilla began acting out, lying, and stealing. She recalled first hearing the allegations against Pitts in February 2018, and she told him "to get the F out of here." She testified that Pitts expressed surprise, but he fled the house before police arrived. Stella went with Camilla to the hospital for the sexual assault exam. After Camilla was discharged from the hospital, Stella took her to stay at Emma's house until Stella found a new house; they never went back to the house they had shared with Pitts. Stella also testified that she had observed pornography on Pitts' phone. At the time of trial, Stella had custody of Camilla.

Emma testified about finding pornography on Alice's phone in February 2018 and confronting Pitts about it at Camilla's house. She also testified about Camilla's outcry to her that day. She further testified that Pitts would watch pornography on a loud volume at his house while Emma was visiting, and she had to tell him to turn it off.

Camilla testified that she was living at the Huntington Valley house when Pitts began sexually abusing her. When Camilla was ten years old, Pitts made up a game called "kings or something" where he and Camilla tried to pull each other's pants down. Eventually, however, the game became one-sided with only Pitts pulling down Camilla's pants "as if [she] was losing the game." This happened "[p]retty

6

often." While still living at this house, Pitts began sexually abusing her "[v]ery often," as in "[d]aily." Camilla testified in detail about three times Pitts sexually abused her at the Huntington Valley house. She also testified that Pitts had sexual intercourse with her often, including two or three times per day when she was thirteen years old.

Maria testified that Pitts also sexually abused her. Initially, Pitts would stare at her inappropriately. The first time he touched her inappropriately, Maria and Camilla were sitting on a couch and Pitts was sitting on the floor. Pitts told Maria to touch his privates. When she resisted, Pitts grabbed her hand, put it down his pants, and made her rub his penis over his underwear. Maria removed her hand, but Pitts bent down and began touching her on her sides underneath her shirt. Another time, when Maria and Alice were sleeping in Camilla's bedroom, Maria woke up in the middle of the night because someone was lying on top of her. She opened her eyes and saw Pitts. She was "shocked" and "scared." Pitts had anal intercourse with her, and afterwards he smirked at her before leaving the room. The final incident involving Maria occurred another night in Camilla's bedroom. Maria was awake when Pitts entered the bedroom, put her on all fours, and pulled down her underwear. Pitts forced Camilla to pin Maria down while Pitts had anal intercourse with Maria. Camilla held Maria's hand and told her not to be scared. Maria resisted and told Camilla that she could not continue. Camilla told Pitts to get off her, and he did so.

He smirked at Maria before leaving the bedroom. Maria was also forensically interviewed and given a sexual assault exam, although no documentation of the interview and exam was introduced into evidence at trial.

Alice testified that when she was twelve years old and playing at Camilla's house, Pitts put his hands inside her pants and tried to pull them down. Alice ran away from him, and he laughed it off. Another time, Alice was trying to sleep in Camilla's bedroom when she saw Pitts sneak in and crawl into bed with Camilla. Alice went back to sleep and did not see any sexual activity, but she saw Pitts crawl into Camilla's bed with Camilla "plenty of times." Finally, Alice testified that Pitts showed her and Camilla inappropriate movies in Pitts' bedroom and tried pulling down Alice's underwear. Alice's mother eventually discovered pornography on Alice's phone, which led to the discovery that Pitts was sexually abusing the girls.

Other witnesses also testified, including a police officer who responded to Camilla's house in February 2018, the investigating detective, and the nurse who performed the sexual assault exam and interview of Camilla at Texas Children's Hospital. The nurse's examination report was admitted into evidence at trial. The primary director at the Children's Assessment Center, where Camilla received two follow-up evaluations, also testified. Two DNA analysts testified that Pitts matched the DNA profile obtained from the semen on the t-shirt recovered by police. Finally,

8

a clinical psychologist testified that Camilla, Maria, and Alice exhibited signs of sexual abuse during their trial testimony.

Neither party objected to the guilt-innocence jury charge. During closing arguments, defense counsel argued in part that Camilla had a propensity to lie, and counsel questioned the credibility of Camilla, Maria, and Alice. After deliberating, the jury found Pitts guilty of the offense of continuous sexual abuse of Camilla, a young child. Before the punishment phase began, defense counsel mentioned to the court that he had attempted to have Pitts' brother testify during the punishment phase, but the brother was "unable to come" to court. Defense counsel did not call any witnesses during the punishment phase. The jury assessed Pitts' punishment at life imprisonment, and the trial court signed a judgment of conviction. *See id.* § 12.32(a). This appeal followed.

## Admission of Extraneous Offense Evidence

In issues two and three,[3] Pitts argues that the trial court abused its discretion by admitting Maria's and Alice's trial testimony about extraneous sexual abuse committed against them by Pitts, even though he acknowledges that such testimony is admissible under Code of Criminal Procedure article 38.37, section 2(b). In issue two, Pitts contends that admission of this testimony violated his right to due process

---

[3]     We consider Pitts' first issue last because our resolution of the issue turns in part on our resolution of Pitts' fourth issue.

under the Fifth and Fourteenth Amendments of the United States Constitution and his right to due course of law under Article I, section 19 of the Texas Constitution and article 1.04 of the Code of Criminal Procedure. In issue three, Pitts contends that this testimony should have been excluded under Rule of Evidence 403 because its probative value was substantially outweighed by a danger of unfair prejudice. The State responds that Pitts did not preserve either complaint for appellate review. We consider these issues together.

## A.     Standard of Review and Preservation of Error

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022). A trial court does not abuse its discretion if its ruling is within the zone of reasonable disagreement. *Id.*

However, we may not reverse a judgment of conviction without first addressing any issue of error preservation because preservation of error is a systemic requirement. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016). Rule of Appellate Procedure 33.1(a) provides that, as "a prerequisite to presenting a complaint for appellate review," the appellate record must show that the complaint was made to the trial court by a timely request, objection, or motion stating the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a)(1)(A); *see Pena v. State*, 285 S.W.3d 459,

10

464 (Tex. Crim. App. 2009) (stating that, to preserve error, complaining party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it") (quotation omitted). Rule 33.1 applies equally to alleged violations of constitutional rights and evidentiary objections. *Darcy*, 488 S.W.3d at 329 (concluding that because "errors in the admission of evidence [are] subject to procedural default, regardless of the constitutional right involved," such errors must be preserved to prevent "forfeit[ure] by inaction"); *Elizondo v. State*, 541 S.W.3d 271, 275 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Presenting a complaint to the trial court "gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464.

Moreover, to preserve error, the complaining party must object each time the inadmissible evidence is offered, obtain a running objection, or request a hearing outside the jury's presence. *Bleimeyer v. State*, 616 S.W.3d 234, 250 (Tex. App.—Houston [14th Dist.] 2021, no pet.). Finally, the complaint on appeal must comport with the specific complaint made in the trial court. *Pena*, 285 S.W.3d at 464.

## B. Analysis

The day before trial, the trial court held a hearing outside the presence of the jury to determine the admissibility of Maria's and Alice's extraneous offense testimony under Code of Criminal Procedure article 38.37. *See* TEX. CODE CRIM.

11

PROC. art. 38.37, §§ 2(b) (authorizing admission of certain extraneous offense evidence), 2-a (providing that prior to admission of extraneous offense evidence, trial court must hold hearing outside jury's presence to determine admissibility of evidence). Defense counsel objected to admission of the testimony, arguing that he did not "believe that [he] was properly noticed on these witnesses" based on a prior discovery order and because he did not "see them on the subpoena list." *See id.* § 3 (requiring State to provide defendant at least thirty days' pretrial notice of intent to introduce extraneous offense evidence). However, counsel eventually acknowledged that Maria and Alice were identified in two pretrial filings, both of which the State filed in 2019, approximately three years before trial. Counsel argued that "that's so remote in time. Circumstances change." Counsel also argued that another attorney represented Pitts at the time of those filings.

The trial judge asked defense counsel if he "need[ed] time to speak to these witnesses or what's the issue? What's the main issue?" Counsel responded that he was "just objecting to them." The judge then asked, "How would you like to cure it? Because more than likely I'm about to let them come and speak. So do you need a day to talk to them or what do you need?" Counsel responded that his "cure would be to exclude the testimony of these witnesses." The State responded that the witnesses were properly noticed. Defense counsel then stated:

> Judge, we're just going to object. I don't believe that the witness list
> was proper because it was so remote in the past and there's been

12

substantial change to the case in terms of who may be testifying and who may not be testifying. A potential witness list is not the same as an actual witness list. And so per . . . the Court's discovery order, the State has not notified me within—longer than ten days before trial of this, and so.

The trial court overruled the objection. Later in the hearing, defense counsel argued that Maria's and Alice's testimony was inadmissible under article 38.37, section 2-a, because their testimony would not prove beyond a reasonable doubt that Pitts committed the extraneous offenses. *See id.* § 2-a(1). At the conclusion of the hearing, the trial court orally granted the State's request to call Maria and Alice as witnesses during trial.

The following day, the State called Alice as a trial witness. Defense counsel reurged his "objections from yesterday about this witness and the extraneous." The trial court overruled the objections, and defense counsel obtained a running objection. Maria testified the day after Alice testified. The record does not reflect that defense counsel renewed the objections or obtained a running objection to Maria's testimony.

At no time during trial did Pitts complain that admission of Maria's or Alice's testimony violated any of his constitutional rights, including his right to due process and to due course of law, as he argues in his second issue. *See* TEX. R. APP. P. 33.1(a)(1); *Darcy*, 488 S.W.3d at 329; *Elizondo*, 541 S.W.3d at 275. Nor did Pitts complain that the testimony violated Rule 403 because its probative value was

13

substantially outweighed by a danger of unfair prejudice, as he argues in his third issue. *See* TEX. R. APP. P. 33.1(a)(1); *Darcy*, 488 S.W.3d at 329; *Elizondo*, 541 S.W.3d at 275. Rather, Pitts' complaint at trial concerned only notice of the witnesses' testimony and whether their testimony would prove beyond a reasonable doubt that he committed the extraneous offenses. *See Pena*, 285 S.W.3d at 464 (stating that, to preserve error, complaint on appeal must comport with specific complaint made in trial court). Pitts concedes on appeal that the State did provide proper notice of its intent to call Maria and Alice as trial witnesses. Therefore, because Pitts' appellate issues concerning Maria's and Alice's testimony does not comport with the complaints he made in the trial court, Pitts has not preserved his second and third issues for appellate review. *See id.* Additionally, we note that Pitts did not reurge his objections to Maria's testimony or obtain a running objection to it, which constitutes a separate ground of waiver of the appellate issues concerning admission of Maria's testimony. *See Bleimeyer*, 616 S.W.3d at 250. We therefore hold that Pitts has waived any error in the admission of Maria's and Alice's trial testimony. We overrule issues two and three.

## Jury Charge

In issue four, Pitts contends that the jury charge erroneously allowed the jury to convict him by finding that he committed two or more acts of sexual abuse at any

14

time during a thirty-day period, even if the acts were not separated by thirty days as required by statute.

## A. Standard of Review

The trial court must submit a charge to the jury "distinctly setting forth the law applicable to the case," but "the jury is the exclusive judge of the facts." *Alcoser v. State*, 663 S.W.3d 160, 164 (Tex. Crim. App. 2022) (quoting TEX. CODE CRIM. PROC. arts. 36.13–.14). The charge serves "to inform the jury of the applicable law and how to apply it to the facts of the case." *Id.* at 164–65.

We review claims of jury charge error under a two-step standard, regardless of whether the error was preserved. *Id.* at 165; *Costilla v. State*, 650 S.W.3d 201, 220 (Tex. App.—Houston [1st Dist.] 2021, no pet.). We first determine whether error exists in the charge. *Alcoser*, 663 S.W.3d at 165; *Paz v. State*, 548 S.W.3d 778, 788–89 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). When reviewing a charge for error, we consider the charge as a whole rather than as a series of isolated and unrelated statements. *Costilla*, 650 S.W.3d at 220. If the charge contains error, then we analyze the error for harm. *Id.*; *see Alcoser*, 663 S.W.3d at 165 (stating that two standards exist for determining harm depending on whether error was preserved).

## B. The Offense and the Jury Charge

Penal Code section 21.02 provides in relevant part:

(b)    A person commits an offense if:

(1)　during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2)　at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:

(A)　a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense . . . .

\* \* \* \*

(d)　If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

TEX. PENAL CODE § 21.02(b), (d). An "act of sexual abuse" includes the commission of several predicate offenses, including aggravated sexual assault and sexual performance by a child. *Id.* § 21.02(c)(4), (6); *see id.* §§ 22.021(a) (aggravated sexual assault), 43.25(b) (sexual performance by child). The Texas Court of Criminal Appeals has stated that, in enacting section 21.02,

the Legislature intended to permit one conviction for continuous sexual abuse based on the repeated acts of sexual abuse that occur over an extended period of time against a single complainant, even if the jury lacks unanimity as to each of the particular sexual acts or their time of occurrence, so long as the jury members agree that at least two acts occurred during a period that is thirty or more days in duration.

*Price v. State*, 434 S.W.3d 601, 605–06 (Tex. Crim. App. 2014). This Court has interpreted section 21.02(b)(1) to require a jury determination that "two or more acts

16

of sexual abuse occurred during a period at least 30 days in duration—i.e., that there is at least 28 days between the day of the first act of sexual abuse and the day of the last act of sexual abuse." *Smith v. State*, 340 S.W.3d 41, 50–51 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

The jury charge in this case tracked the statutory elements nearly verbatim. In relevant part, the charge provided:

> Our law provides that a person commits an offense if *during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse*, regardless of whether the acts of sexual abuse are committed against one or more victims; and, at the time of the commission of each of the acts of sexual abuse, the person was 17 years of age or older and the victim is a child younger than 14 years of age.
>
> * * * *
>
> In order to find the defendant guilty of the offense of continuous sexual abuse of a young child, you are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. However, in order to find the defendant guilty of the offense of continuous sexual abuse of a young child, you must agree unanimously that the defendant, *during a period that is 30 or more days in duration*, committed two or more acts of sexual abuse.
>
> Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, the defendant, Bernell Pitts, heretofore on or about the 13th day of May, 2016 through the 13th day of May, 2017, did then and there unlawfully, *during a period of time of thirty or more days in duration*, commit at least two acts of sexual abuse against a child younger than fourteen years of age including an act constituting the offense of aggravated sexual assault of a child, committed against [Camilla] on or about May 13, 2016, and an act constituting the offense of aggravated sexual assault of a child, committed against [Camilla] on or about May 13, 2017, and the defendant was at least seventeen years of age at the time of the commission of each of those acts, then you will

17

find the defendant guilty of continuous sexual abuse of a child, as charged in the indictment.

(Emphasis added.)

**C.    Analysis**

Pitts argues that the phrase "during a period that is 30 or more days in duration" erroneously authorized the jury to convict him of conduct that occurred during a period that was less than thirty days in duration. Pitts relies on three cases to support his argument.

Pitts primarily relies on this Court's prior decision in *Smith v. State*, in which the Court determined that the following language in the jury charge constituted error:

> Now, if you find from the evidence beyond a reasonable doubt that *on or about the 1st day of December, 2007, through the 1st day of September, 2008, which said time period being a period that was 30 days or more in duration*, in Brazoria County, Texas, the defendant, Jesse James Smith, committed two or more acts of sexual abuse against [the complainant], . . .

340 S.W.3d at 50. We reasoned that the charge "lack[ed] clarity" because the phrase "30 days or more in duration" referred to the period specified in the indictment— December 2007 to September 2008—rather than to the commission of "two or more acts of sexual abuse." *Id.* In doing so, the charge "allowed the jury to find [the defendant] guilty so long as two or more acts of sexual abuse occurred between December 2007 and September 2008 regardless of whether the acts occurred at least 30 days apart." *Id.* The instruction thus erroneously implied that because December

18

2007 and September 2008 were more than thirty days apart, any two or more acts of sexual abuse committed within that period were sufficient to support a conviction even if the acts were not separated by thirty days. *Id.* We held that the charge was erroneous because it did not require a jury determination that "two or more acts of sexual abuse occurred during a period at least 30 days in duration—i.e., that there is at least 28 days between the day of the first act of sexual abuse and the day of the last act of sexual abuse." *Id.* at 50–51. We ultimately concluded, however, that the error did not cause egregious harm to the defendant. *Id.* at 53.

*Smith* is distinguishable. In that case, the thirty-day durational language immediately followed and referred to the dates in the indictment rather than the statutory requirement that two or more acts of sexual abuse must occur during a period that is thirty or more days in duration. *Id.* at 50–51; *see also* TEX. PENAL CODE § 21.02(b)(1) (providing, as element of offense, that defendant must "during a period that is 30 or more days in duration," commit "two or more acts of sexual abuse"). Here, by contrast, the durational language appeared in the middle of the unlawful action clause: the jury could convict Pitts if it found that he "unlawfully, *during a period of thirty or more days in duration*, commit[ted] at least two acts of sexual abuse . . . ." (Emphasis added.) The durational language acted as a type of subordinate adjective clause modifying the unlawful commission of two or more acts of sexual abuse. The placement of the durational language thus distinguishes

19

the jury charge in this case from that in *Smith*. Moreover, the charge language in this case more closely tracks the statutory language than the charge language in *Smith*. *See* 340 S.W.3d at 50. Therefore, *Smith* does not support Pitts' argument that the jury charge in this case contained error.

Pitts also relies on *Turner v. State*, in which the Amarillo Court of Appeals determined that the following jury charge language contained error:

> [I]f you unanimously believe from the evidence beyond a reasonable doubt, that the defendant, . . . on or about June 1, 2013 through August 1, 2013, in the County of Randall, and State of Texas, *during a period that was 30 days or more in duration* and when the Defendant was 17 years of age or older, did intentionally or knowingly commit two or more acts of sexual abuse against [the complainant], a child younger than 14 years of age . . . .

573 S.W.3d 455, 462 (Tex. App.—Amarillo 2019, no pet.) (emphasis added). The State argued that the charge was not erroneous because it tracked the statutory language, but the court disagreed. *Id.* This argument assumed "that the statute itself is an example of clarity," but "the express language" used in the disputed jury charge did not "make it clear that the first and last acts must occur thirty or more days apart." *Id.* The court held that the charge was erroneous because it "suggest[ed] to the jury that the thirty-day requirement was met if it found [the defendant] committed two or more acts during a period of thirty days or more." *Id.* at 463. As in *Smith*, the *Turner* court ultimately concluded that the error did not cause egregious harm to the defendant. *Id.* at 464.

20

*Turner* too is distinguishable. The durational language in the charge appeared between the indictment dates—June 2013 and August 2013—and the two-or-more-acts language, and it is not clear that the durational language references one or the other. *See id.* at 462–63. Here, as discussed above, the durational language appeared as a subordinate adjective clause contained within the unlawful two-or-more-acts language, and thus the durational language referenced and modified the two-or-more-acts language. Therefore, like *Smith*, *Turner* is distinguishable and does not support Pitts' argument.

Finally, Pitts relies on *Pelcastre v. State*, which concerned a challenge to the following jury charge language authorizing a conviction if the jury found that the defendant

> on or about the 12th Day of December, 2017 through on or about the 16th day of March, 2018, did then and there unlawfully, during a period of time of thirty or more days in duration, commit at least two acts of sexual abuse against a child younger than fourteen years of age . . . .

654 S.W.3d 579, 586 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd). Although this charge is identical to the charge here, the Fourteenth Court of Appeals did not decide whether the charge contained error. *Id.* at 588. Instead, the court noted conflicting intermediate appellate court decisions on the issue, including *Smith* and *Turner* on the one hand and several other decisions on the other hand, and the court stated that it was unclear whether the phrase "during a period of time of thirty or more days in duration" modified the period of time alleged in the indictment or the

21

unlawful commission of two or more acts of sexual abuse. *Id.* at 587–88. Due to this conflict, the court bypassed an error analysis and considered whether the defendant was egregiously harmed by any error in the charge. *Id.* at 588–90. Because *Pelcastre* did not decide that the charge language was erroneous, it does not support Pitts' argument that the jury charge in this case contained error.

In response, the State relies on two decisions by the Fourteenth Court of Appeals construing jury charges with identical language to the charge here. In *Moreno v. State*, the Fourteenth Court held that the following charge language was not erroneous where it authorized a conviction if the jury found that the defendant

> on or about . . . August 26, 2013 continuing through August 2, 2016, did then and there unlawfully, *during a period of thirty or more days in duration*, commit at least two acts of sexual abuse.

No. 14-18-00113-CR, 2019 WL 2000905, at *3 (Tex. App.—Houston [14th Dist.] May 7, 2019, pet. ref'd) (mem. op., not designated for publication). The court reasoned that the charge did not contain error because its language tracked the statutory language in section 21.02 and "clearly provided that two or more acts of sexual abuse, if the jury found they occurred, must have occurred during a period thirty or more days in duration to support a conviction, and that the jury must unanimously so find." *Id.*

In *Lewis v. State*, the Fourteenth Court held that the following jury charge language did not contain error where it authorized a conviction if the jury found that the defendant

> on or about the 9th day of October, 2016 continuing through the 15th day of May, 2019, did then and there unlawfully, during a period of time of thirty or more days in duration, commit at least two acts of sexual abuse against a child . . . .

— S.W.3d —, No. 14-21-00691-CR, 2023 WL 4873306, at *4, 8 (Tex. App.—Houston [14th Dist.] Aug. 1, 2023, pet. ref'd). The court first distinguished *Smith* "because it involved materially distinguishable charge language." *Id.* at *7. Unlike the *Smith* charge, the *Lewis* charge followed the statutory text "almost verbatim" and did not imply that the indictment dates, which were more than thirty days apart, satisfied the statute: "Instead, the language 'during a period of time of thirty or more days in duration' refers to the 'commit at least two acts of sexual abuse' language." *Id.* The court also reasoned that the language was nearly identical to that in the *Moreno* charge, which the court had previously upheld. *Id.* The court stated that "[g]enerally, a jury charge that tracks statutory language is not erroneous," although the court noted that "merely following statutory text is not always sufficient to further the charge's purpose of preventing confusion." *Id.*

We agree with the State that *Lewis* and *Moreno* are analogous to this case. *See, e.g., id.* The charge in this case is nearly identical to the charges in those cases, it is distinguishable from the *Smith* charge, and it follows the statutory text almost

23

verbatim. *See id.* ("Generally, a jury charge that tracks statutory language is not erroneous."). Furthermore, the durational language refers to the language concerning two or more unlawful acts of sexual abuse. We agree with the *Lewis* court that "this particular statutory text [is not] confusing, and we do not fault the trial judge for having followed it in instructing the jury." *See id.* We conclude that Pitts has not established that error exists in the jury charge. *See Alcoser*, 663 S.W.3d at 164–65. We overrule issue four.

**Ineffective Assistance of Counsel**

Finally, in his first issue, which has three subparts, Pitts contends that his trial counsel provided ineffective assistance of counsel.

**A.     Standard of Review and Governing Law**

The Sixth Amendment to the United States Constitution guarantees the right to counsel in criminal prosecutions, which is necessary to protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). "[T]he right to counsel is the right to the effective assistance of counsel." *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

To prevail on a claim of ineffective assistance of counsel, the defendant must prove by a preponderance of the evidence that (1) his trial counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Id.* at 687; *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018) (op. on reh'g). We

24

cannot sustain a claim of ineffective assistance of counsel unless the defendant proves both prongs. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). In conducting our review, we consider the totality of the representation. *Strickland*, 466 U.S. at 695; *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013).

Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688; *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). Our review of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689; *Mata v. State*, 226 S.W.3d 425, 428 (Tex. Crim. App. 2007); *see also Frangias*, 450 S.W.3d at 136 (stating that defendant is not entitled to errorless representation). The defendant must overcome "a strong presumption" that counsel's performance was reasonable. *Strickland*, 466 U.S. at 689. To defeat the presumption, any deficiency in counsel's performance must be firmly founded in the appellate record. *Prine*, 537 S.W.3d at 117; *Dryer v. State*, 674 S.W.3d 635, 646 (Tex. App.—Houston [1st Dist.] 2023, pet. ref'd) (op. on reh'g).

It is insufficient that counsel's performance may seem questionable in hindsight. *Dryer*, 674 S.W.3d at 646–47; *accord Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). We will not find ineffective assistance based on

25

conjecture. *Dryer*, 674 S.W.3d at 647. Nor will we infer ineffective assistance based on unclear portions of the record. *Id.* Rather, the record must affirmatively demonstrate that counsel's performance was deficient. *Id.*

Rarely will the trial record alone sufficiently show deficient performance. *Lopez*, 343 S.W.3d at 143; *Dryer*, 674 S.W.3d at 647. The reasonableness of counsel's trial decisions often depends on facts that do not appear in the record. *Dryer*, 674 S.W.3d at 647. Ordinarily, counsel should be given an opportunity to explain his or her conduct before we find that counsel's performance was deficient. *Id.* When counsel has not been given this opportunity, we cannot find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Dryer*, 674 S.W.3d at 647. The record must show that counsel's performance fell below an objective standard of reasonableness as a matter of law and that no reasonable trial strategy could justify the performance. *Lopez*, 343 S.W.3d at 143; *Dryer*, 674 S.W.3d at 647. We generally will assume that counsel had a reasonable strategic motive if any reasonable trial strategy can be imagined. *Lopez*, 343 S.W.3d at 143; *Dryer*, 674 S.W.3d at 647.

Counsel's deficient performance prejudices the defendant when there is a reasonable probability that but for counsel's deficient performance, the outcome of

26

the trial would have been different. *Dryer*, 674 S.W.3d at 647. A reasonable probability is one that undermines our confidence in the trial's outcome. *Id.*

## B. Analysis

Pitts contends that his trial counsel was ineffective because counsel: (1) rejected the trial court's offer of a continuance when counsel was surprised by the State's calling of a properly noticed witness; (2) did not introduce any evidence during the punishment phase of trial or seek a continuance until Pitts' brother was able to testify; and (3) did not object to jury charge error.

### 1. Rejection of Continuance for Surprise Witness

Pitts first argues that his trial counsel was ineffective because counsel was surprised when the State called Maria to testify about extraneous offenses, even though the State properly noticed her as a witness.[4] Pitts argues that defense counsel did not accept the trial court's offer of a continuance of the article 38.37 hearing, and counsel was unprepared for her trial testimony as shown by counsel's brief cross-examination.

As we discussed above in issues two and three, defense counsel objected to the admission of Maria's and Alice's trial testimony during an article 38.37 hearing. *See* TEX. CODE CRIM. PROC. art. 38.37. Counsel argued that the State had not

---

[4] Pitts does not argue on appeal that his counsel was ineffective for not seeking a continuance prior to Alice's testimony.

27

provided proper notice of its intent to call them as witnesses, although Pitts conceded at trial and in his appellate brief that he did receive proper notice. The trial judge nevertheless asked defense counsel if he "need[ed] a day to talk to them" or how counsel wanted "to cure it," but counsel responded only that his proposed "cure would be to exclude the testimony of these witnesses." The trial court overruled the objection and granted the State's request to call Maria and Alice as trial witnesses to testify about extraneous offenses committed by Pitts. Two days after this hearing, Maria testified at trial. Defense counsel did not renew the prior objections to Maria's testimony, and counsel briefly cross-examined her.

The appellate record does not support Pitts' argument that his trial counsel was surprised when the State called Maria as a witness. *See Dryer*, 674 S.W.3d at 647 (stating that record must affirmatively demonstrate counsel's alleged ineffectiveness). Although counsel objected to admission of her testimony based on lack of notice, counsel ultimately acknowledged that two pretrial filings identified Maria as a potential witness for the State. Counsel argued that the notice was too "remote in time." Counsel did not state that he was surprised by the State calling Maria as a witness or that he was unaware of the substance of her testimony. Rather, counsel objected solely on the procedural ground of lack of notice. Furthermore, during Maria's trial testimony, counsel did not lodge any objections based on surprise or express any surprise at all. Thus, Pitts' argument that his counsel was

28

surprised when the State called Maria as a witness is supported by conjecture, not by the appellate record, and thus it is insufficient to establish that counsel was deficient. *See id.*

Moreover, we note that the appellate record is replete with references to Pitts' sexual abuse of Maria, which contradicts Pitts' argument that his counsel was surprised when the State called her as a witness. The initial complaint against Pitts alleged that "[Pitts] tried to make her [Camilla] have sex with her cousin [Maria] and to pull her pants down and lick her private and she refused to do it." Moreover, the State filed pretrial notices alleging in extensive detail Pitts' misconduct involving Maria. For example, the State's notice of intent to introduce Emma's statements summarized outcries that both Camilla and Maria had made to Emma. Maria said that "[Pitts] had sex with her about four times and [Camilla] watched," and "[Pitts] had vaginal sex with her." Camilla told Emma that "[Pitts] had sex with her cousin [Maria] and did it multiple times to her." Camilla also "admitted to letting [Maria] watch porn to get her comfortable with being with [Pitts]."

Several other pretrial filings also mentioned Maria's allegations that Pitts had sexually abused her, including the State's notice of intent to use Maria's outcry statement during trial, which detailed similar allegations as those in the filings discussed above. The State's pretrial notice of intent to use extraneous offense evidence also generally alleged more than twenty acts of sexual misconduct

29

committed by Pitts against Maria. The State also filed pretrial applications for subpoenas before a 2019 trial setting and before trial requesting that Maria's mother bring Maria to court.

In addition to these pretrial filings, the evidence admitted at trial—and presumably served to defense counsel prior to trial[5]—mentions Maria's allegations. In the report from Texas Children's Hospital, where Camilla was taken after her outcry, Camilla reported that "I have a cousin [Maria] who they all call my twin. My dad [Pitts] told me to make her be quiet while my dad had sex on her in the summer. He said if I didn't do it that I'm gonna get whooped." Camilla also reported that "[Pitts] tried to make me have sex with my twin ([Maria]). I said no. He was telling me, go pull her pants down and lick her privates. I refused to do it."

The numerous references to Maria's extraneous allegations against Pitts throughout the pretrial filings and evidence in this case strongly contradict Pitts' claim that his counsel was surprised when the State called Maria as a trial witness. These serious allegations were similar to Camilla's allegations, and thus Maria's testimony was relevant to whether Pitts committed the charged offense of continuous sexual abuse of Camilla. *See Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.— Houston [1st Dist.] 2017, no pet.) ("[E]vidence that a defendant has sexually abused

---

[5] Pitts does not complain on appeal that his counsel was not served with any of the documentary evidence admitted at trial.

another child is relevant to whether the defendant sexually abused the child-complainant in the charged case."). Indeed, Maria's testimony is precisely the type of evidence that is expressly admissible under article 38.37 "for any bearing the evidence has on relevant matters, including the character of [Pitts] and acts performed in conformity with the character of [Pitts]." *See* TEX. CODE CRIM. PROC. art. 38.37, § 2(b). Thus, considering that defense counsel did not express surprise when the State called Maria as a witness, the ample record references to her similar allegations of sexual misconduct against Pitts indicate that counsel was not surprised by her testimony. *See Dryer*, 674 S.W.3d at 646 (stating that to defeat strong presumption that counsel's performance was reasonable, alleged deficiency in performance must be firmly founded in appellate record).

We also disagree that the record affirmatively shows counsel was unprepared for Maria's testimony. As discussed above, Maria testified at trial two days after the hearing at which counsel objected to her testimony on the ground of lack of notice. At no time during Maria's trial testimony did defense counsel renew the objections to her testimony, express his lack of preparation to cross-examine her, or request a continuance. We agree with the State that despite counsel's objections at the pretrial hearing, counsel nevertheless had two days to prepare for Maria's trial testimony after making the objections.

Furthermore, while Pitts correctly notes that defense counsel only briefly cross-examined Maria compared to the State's direct examination, this alone does not necessarily indicate that counsel was unprepared. "Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Jones v. State*, 500 S.W.3d 106, 115 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005)). Moreover, "cross-examination is an art, not a science, and it cannot be adequately judged in hindsight." *Id.* (quoting *Ex parte McFarland*, 163 S.W.3d at 756). An ineffective cross-examination can bolster a witness's credibility and emphasize points intended to impeach a witness. *Id.* "Thus, unless there is a good basis on which to cross-examine, . . . it can be more effective to refrain from cross-examining a damaging witness to minimize the impact of his testimony." *Id.* (quoting *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd)).

Our review of the appellate record does not reveal that counsel performed deficiently. Counsel asked Maria about her identification of Pitts as her sexual abuser, eliciting testimony that the abuse occurred at nighttime and the lights were off "one time." Counsel also attempted to impeach her identification of Pitts with her prior statement to the forensic interviewer that she just had a feeling it was Pitts. This impeachment line of questioning shows that counsel was at least somewhat

32

prepared for Maria's testimony. Defense counsel also elicited testimony that Maria and Camilla were close and would do anything for each other. This testimony supported the defense's theory that Camilla was lying about her allegations. And the testimony about Maria's hesitant identification of Pitts supported the defense theory that Maria was also lying. Therefore, we cannot conclude on the record before us that counsel was deficient for failing to be prepared for Maria's trial testimony. *See Dryer*, 674 S.W.3d at 646 (stating that to defeat strong presumption that counsel's performance was reasonable, alleged deficiency in performance must be firmly founded in appellate record).

### 2. Failure to Offer Evidence at Punishment Phase

Next, Pitts argues that his trial counsel was deficient for failing to put on any evidence during the punishment phase of trial and for failing to request a continuance until Pitts' brother was able to testify. His counsel therefore presented no evidence to counter the State's characterization of him as a "monster" who "doesn't deserve leniency."

Defense counsel did not introduce any evidence or call any witnesses during the punishment phase of trial. At one point during trial, defense counsel stated to the court: "Mr. Pitts, prior to this trial, had furnished me with the phone number of his brother, Kendrick. I had spoken to his brother and attempted to get his brother down here to testify at punishment and his brother was unable to come, so." Pitts relies

33

solely on this statement to argue that his counsel was ineffective for failing to call any witnesses. Defense counsel did not further object or request a continuance based on the inability of Pitts' brother to come to court, and this is the sole reference in the appellate record to this witness.

As Pitts acknowledges on appeal, counsel's "failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *See Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). It is not clear from counsel's statement whether Pitts' brother was available to testify even if he was "unable to come" to trial. *See id.* Defense counsel did not provide any explanation for the brother's inability to be present in court, and no other record evidence clarifies whether the brother was available to testify. Therefore, we cannot conclude on the record before us that Pitts' brother was available to testify. *See id.*

Moreover, Pitts makes no argument on appeal that he would have benefitted from his brother's testimony. *See id.* Nor does Pitts point to any evidence showing the substance of his brother's proposed testimony. We therefore cannot conclude on the record before us that Pitts would have benefitted from his brother's testimony or that defense counsel was deficient for failing to call Pitts' brother as a witness at trial. *See id.*

34

Pitts does not argue that any other witness would have been available to provide beneficial testimony on his behalf. *See id.* Nor does Pitts point to any other evidence that his counsel could have offered to benefit his defense. We therefore hold that on the record before us, Pitts has not established that his counsel was deficient for failing to introduce evidence during the punishment phase of trial. *See Dryer*, 674 S.W.3d at 647 (stating that ineffective assistance claim must be firmly founded in appellate record).

### 3. Failure to Object to Jury Charge Error

Finally, Pitts argues that his counsel was ineffective for failing to object to the part of the jury charge that Pitts contends erroneously allowed the jury to find him guilty based on two or more instances of sexual abuse that were not separated by at least thirty days. *See* TEX. PENAL CODE § 21.02(b)(1). This argument relates to Pitts' third issue concerning jury charge error, which we discussed above.

We have already determined that the jury charge did not contain error. Accordingly, we necessarily conclude that Pitts' counsel was not deficient for failing to object to a proper jury charge. *Riles v. State*, 595 S.W.2d 858, 861 (Tex. Crim. App. 1980); *Lewis*, 2023 WL 4873306, at *14 ("Because we have considered the jury charge issue on the merits and have concluded that there was no error in the jury charge, we necessarily find appellant has also failed to show he received ineffective assistance of counsel in this regard."). We overrule issue one.

## Conclusion

We affirm the trial court's judgment of conviction.

April L. Farris
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).